**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**SOUTHERN DIVISION**
**NO. 7:23-CV-897**

**IN RE:**

**CAMP LEJEUNE WATER LITIGATION**

**This Document Relates To:**

**Mousser v. United States, No. 7:23-cv-00667**

**DEFENDANT UNITED STATES' MEMORANDUM OF CONTROLLING LAW AND CONTESTED LEGAL AND EVIDENTIARY QUESTIONS**

**L. Civ. R. 7.2; 39.1(a)**

## TABLE OF CONTENTS

Table of Contents ..... i

Introduction ..... 1

I. Controlling Law Per This Court's Orders ..... 2

A. The CLJA's Relaxed Burden of Proof Does Not Relieve Plaintiff Mousser of the Obligation to Prove Both General and Specific Causation. ..... 2

B. Congress Did Not Modify the Rule 702 Admissibility Standard for Expert Testimony. ..... 4

1. An Expert's Methodology Must Be Reliable and Reliably Applied. ..... 4

2. Expert Requirements for the Bradford-Hill Analysis ..... 5

a. Step One – Identify a Statistically Significant Association ..... 5

b. Step Two – Determine Whether the Association Supports a Causal Inference ..... 6

3. Expert Requirements for the Weight-of-the-Evidence Analysis ..... 7

4. The CLJA Does Not Permit Experts to Reduce Their Level of Intellectual Rigor for Litigation. ..... 7

C. Vapor Intrusion is Not "Water at Camp Lejeune That Was Supplied By or On Behalf of the United States." ..... 8

D. Pursuant to the Plain Language of the CLJA, the United States is Entitled to Offsets as a Deduction from Any Award. ..... 9

1. The Court May Consider Future Offsets. ..... 10

2. Offsets Apply to Any Award. ..... 10

3. Medical Expenses and Offsets are Distinct Matters of Proof. ..... 11

II. Contested Evidentiary Issues ..... 11

A. The Court Should Exclude Expert Testimony Related to Use of ATSDR's Water Models to Determine Plaintiff's Individual Exposure Levels to Contaminants at Camp Lejeune. ..... 12

B. The Court Should Exclude the General Causation Reports and Testimony of Experts Who Relaxed Their Methodologies Based on the CLJA's Modified Burden of Proof. ..... 13

1. Dr. Steven Bird ..... 14

2. Dr. Benjamin Hatten ..... 16

C. The Court Should Exclude General Causation Testimony Related to PCE, Benzene, and Vinyl Chloride. ..... 17

D. The Court Should Exclude the Reports and Testimony of Dr. Bird and Dr. Hatten for Conducting an Unreliable Literature Review. ..... 18

1. The Experts Utilized Unreliable Methodologies to Obtain the Landscape of Relevant Literature. ... 18
2. The Experts Cherry-Picked the Few Studies Supporting Their Conclusions. ... 19
3. The Experts Ignored Numerous Study Limitations. ... 19
4. The Experts Cherry-Picked Results Within Studies. ... 20
E. The Court Should Exclude Expert Testimony Regarding *trans*-1,2-Dichloroethylene. ... 20
F. The Court Should Exclude the Improper Differential Diagnosis Opinions of Plaintiff's Specific Causation Experts Dr. Joseph Del Pizzo and Dr. Armine Smith. ... 21
G. The Court Should Grant the United States' Motion for Summary Judgment in This Matter. ... 22
III. Anticipated Legal and Evidentiary Issues ... 23
A. Non-Track 1 Diseases ... 23
B. The Court Should Preclude Plaintiff's Specific Causation Experts Dr. Joseph Del Pizzo and Dr. Armine Smith From Offering General Causation Testimony. ... 24
C. The United States Reserves the Right to Raise Additional Legal or Evidentiary Issues. ... 25
Certificate of Service ... 27

## INTRODUCTION

Plaintiff Frank Mousser seeks to recover damages against the United States under the Camp Lejeune Justice Act of 2022 (CLJA), alleging that he was exposed to contaminated water at Camp Lejeune and that such exposure caused his Track 1 disease, upper tract urothelial cancer (UTUC). The United States denies that any contaminants present in the Camp Lejeune water caused his disease. At trial, the evidence will show that Plaintiff has no reliable expert testimony proving (1) that the contaminants at the levels present at Camp Lejeune can cause his Track 1 disease; and (2) that those contaminants did, in fact, cause his Track 1 disease.

Mr. Mousser was stationed at Camp Lejeune from October 18, 1982 to September 7, 1986. While at Camp Lejeune, he resided and worked in the French Creek area. Nine water distribution systems supplied water at Camp Lejeune between 1953 and 1987: Hadnot Point, Tarawa Terrace, Holcomb Boulevard, Camp Geiger, Camp Johnson (also known as Montford Point), Courthouse Bay, Marine Corps Air Station New River, Onslow Beach, and Stone Bay Rifle Range (also known as Rifle Range). In 1984 and 1985, small amounts of benzene, a component of fuel, and the trichloroethylene (TCE) degradation byproducts perchloroethylene (PCE), 1,2-trans dichloroethylene (DCE), and vinyl chloride were discovered in a limited number of wells supplying the Hadnot Point Water Treatment Plant. In September 2020, Mr. Mousser was diagnosed with UTUC. Mr. Mousser claims that his UTUC was caused by his exposure in the 1980s to contaminated water at Camp Lejeune.

Pursuant to Local Civil Rule 39.1(a), the United States submits this Memorandum summarizing the law of the case as decided by this Court, as well as the United States' pending and anticipated issues of law and evidentiary admissibility. Section I of this Memorandum summarizes the Court's prior orders governing the CLJA litigation. Section II summarizes the United States' pending evidentiary motions and arguments in support. Section III summarizes

various evidentiary issues that the United States anticipates being raised either prior to or at the trial on this matter.[1]

## I. Controlling Law Per This Court's Orders

Throughout this litigation, the Parties have raised many issues of substantive law and evidentiary admissibility. The Court has issued orders resolving several of the Parties' contested issues of law, and those orders outline the controlling parameters of this case.

### A. The CLJA's Relaxed Burden of Proof Does Not Relieve Plaintiff Mousser of the Obligation to Prove Both General and Specific Causation.

The CLJA "allows an 'individual' to bring an action for 'appropriate relief for harm that was caused by exposure to the water at Camp Lejeune.'" *In re Camp Lejeune Water Litigation*, 736 F. Supp. 3d 311, 317 (E.D.N.C. 2024) (quoting CLJA § 804(b)).[2] Individuals "can prove that their individual exposure caused their harm [(1)] by proof 'sufficient to conclude that a causal relationship exists' between exposure and harm or [(2)] by a reduced burden of proof ('sufficient to conclude that a causal relationship [between exposure and harm] is at least as likely as not')." *Id.* at 319 (quoting CLJA § 804(c)(2)(A)-(B)).

Although the CLJA's relaxed burden of proof is a departure from the "common-law preponderance burden of proof standard," such departure "does not demonstrate Congress's intent

[1] Unless otherwise indicated, the Docket Entries in this Memorandum are to the Court's Master Docket for this litigation, Case No. 7:23-cv-897.

[2] The CLJA includes a "threshold individual exposure requirement of no less than 30 days" between August 1, 1953 and December 31, 1987. *In re Camp Lejeune Water Litig.*, 736 F. Supp. 3d at 321-22. For purposes of the Track 1 bellwether trials, the United States does not challenge whether the Track 1 Trial Plaintiffs have met this threshold requirement to bring an action. *See* Aug. 20, 2024 Jt. Stat. Rpt., D.E. 277, at 3. However, the United States reserves the right to argue that any individual Plaintiff may not have been exposed to contaminated water at Camp Lejeune, based on their time and location on base. Moreover, the United States disputes that merely being present somewhere at Camp Lejeune for 30 days or more during the statutory time period is sufficient evidence of general or specific causation.

to replace the common-law causation framework." *Id.* at 323; *see id.* at 325 (clarifying that the phrase "as likely as not" "pertains to burdens of proof, not causation"). Indeed, this Court expressly rejected the notion that Congress intended to adopt a reduced causation standard based upon the Department of Veterans Affairs' (VA) "presumption-based system for benefits." *Id.* at 324. As the Court explained, the VA presumes service-connection for certain diseases for veterans who served at least 30 days at Camp Lejeune between August 1, 1953 and December 31, 1987, but that presumption "can be rebutted" by "sufficient 'evidence . . . that the disease was not incurred in service.'" *id.* at 326-27 (quoting 38 C.F.R. § 3.307(d)). The Court declined to incorporate such a presumption into the CLJA, as Plaintiffs urged, because interpreting the CLJA to require less from plaintiffs seeking tort damages than veterans seeking VA benefits "defies the plain language of the statute and would produce 'absurd results . . . .'" *Id.* at 327 (quoting *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 575 (1982)).

The Court noted that under the common law, "to show a causal 'relationship' between 'exposure and harm,'" *id.* at 320 (quoting CLJA § 804(c)), Plaintiff must prove both general and specific causation—that is, he must demonstrate through admissible expert testimony that his "exposure to an agent *can* cause the disease at issue" (general causation), and that his "exposure was a cause *in fact* of his . . . harm (specific causation)." *Id.* at 319, 322 (emphasis added). Specific causation requires a "but-for analysis," meaning that, "'in the absence of the [exposure], the [harm] would not have occurred.'" *Id.* at 319 (quoting Restatement (Third) of Torts: Phys. & Emot. Harm § 26 cmt. (b)). Therefore, to obtain "relief for harm that was caused by exposure to the water at Camp Lejeune," CLJA § 804(b), a plaintiff must prove: (1) "individual exposure . . . of no less than 30 days" (exposure), *id.* at 321-22; (2) to "an agent . . . [that] *can* cause the disease at issue" (general causation), *id.* at 322 (emphasis added); and (3) a "causal relationship" between "exposure

to the water at Camp Lejeune and the harm . . . at least as likely as not" (specific causation), *id.* at 323-24.

### B. Congress Did Not Modify the Rule 702 Admissibility Standard for Expert Testimony.

As discussed above, "Congress established a CLJA action as a modified form of toxic tort claim, requiring evidence of both general and specific causation, with a modified burden of proof." *In re Camp Lejeune Water Litig.*, 736 F. Supp. 3d at 324. However, just as this modified burden of proof does not relieve a plaintiff from proving both general and specific causation, "Congress lowering the statutory burden of proof for a CLJA claim does not affect Rule 702's admissibility standard for expert opinion." June 5, 2026 Order at 14 n.2, D.E. 886 [hereinafter Expert Admissibility Order].

The Court has provided the Parties with a thorough opinion delineating between admissible and inadmissible expert testimony. *See* Expert Admissibility Order, D.E. 886, *passim*. For expert testimony to be admissible, Federal Rule of Evidence 702 requires that (1) "the proposed expert witness is qualified;" (2) "the proposed testimony is relevant;" and (3) "the proposed testimony is reliable." *Id.* at 4-5 (citations omitted). Experts must exercise "in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 14 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)). Rule 702's admissibility "standard is 'more likely than not'" and "[t]he court will hold every expert in this litigation to this standard as applied to the expert's field and chosen method." *Id.* at 17 (quoting Fed. R. Evid. 702 advisory committee's note to 2023 amendment).

#### *1. An Expert's Methodology Must Be Reliable and Reliably Applied.*

Rule 702 requires an expert's opinion to "reflect a reliable application of the principles and methods to the facts of the case." Expert Admissibility Order at 17, D.E. 886. As in all toxic-tort

actions, Plaintiff's experts must "prove general causation through epidemiological evidence, dose-response relationship, and background risk of disease." *Id.* at 10 (quoting *In re Deepwater Horizon BELO Cases*, 119 F.4th 937, 941 (11th Cir. 2024)). Experts relying on epidemiological evidence to "distinguish a causal connection from a mere association" apply the "two-step Bradford Hill method," the "weight-of-the-evidence method," or a combination of the two. *Id.* at 10, 12 (quoting *In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*, 858 F.3d 787, 795 (3d Cir. 2017)). "Although the Bradford Hill and weight-of-the-evidence methods are 'generally reliable, the "techniques" used to implement the analysis must be 1) reliable and 2) reliably applied.'" *Id.* at 13 (quoting *In re Zoloft*, 858 F.3d at 796). Therefore, "'any step that renders the analysis unreliable under [Rule 702] renders the expert's testimony inadmissible[,] . . . whether the step completely changes a reliable methodology or merely misapplies that methodology.'" *Id.* (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994)).

### *2. Expert Requirements for the Bradford-Hill Analysis*

The Bradford-Hill method proceeds in two steps. The first step requires an expert to "identify a statistically significant association" between the toxic agent and the disease in question. Expert Admissibility Order at 10, D.E. 886. At step two, the expert "considers nine factors to determine whether that association [identified in step one] supports a causal inference." *Id.* at 11.

#### *a. Step One – Identify a Statistically Significant Association*

For purposes of step one of the Bradford-Hill analysis – identifying a statistically significant association – "a statistically significant association" exists "only when the odds ratio is expressed with a 95% confidence interval ***(consistently)*** and when that interval does not include an odds ratio of 1.0 or below.'" Expert Admissibility Order at 11, D.E. 886 (emphasis added) (quoting *Smith v. Wyeth-Ayerst Lab'ys Co.*, 278 F. Supp. 2d 684, 691 n.8 (W.D.N.C. 2003)). This standard requires the expert to "rul[e] out alternative explanations" for "'a potential association

result[ing] from limitations in the study, like chance or bias.'" *Id.* at 10 (quoting *In re Deepwater Horizon*, 119 F.4th at 941). An expert must "find a statistically significant association at step one before moving on to apply the factors at step two." *Id.* at 12 (quoting *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Prods. Liab. Litig.*, 174 F. Supp. 3d 911, 924-25 (D.S.C. 2016)); *see also id.* at 11 (observing that an expert may only proceed to step two after identifying in step one a "statistically significant" association, or one that is "'perfectly clear-cut and beyond what we would care to attribute to the play of chance'" (quoting *Dunn v. Sandoz Pharms. Corp.*, 275 F. Supp. 2d 672, 678 (M.D.N.C. 2003) and collecting cases))). As this Court observed, "failure to find a statistically significant association ***before proceeding*** is ***fatal*** to the opinion's admissibility." *Id.* at 16 (emphasis added). Accordingly, experts who "deviate[] from this norm" do not reliably apply the Bradford Hill methodology and their testimony is therefore "subject to exclusion." *Id.* at 12 (emphasis omitted) (quoting *Lipitor (Atorvastatin Calcium) Mktg. v. Pfizer, Inc.*, 892 F.3d 624, 640-42 (4th Cir. 2018)).

*b. Step Two – Determine Whether the Association Supports a Causal Inference*

After identifying a statistically significant association that meets the threshold requirement of Bradford-Hill, the expert must reliably apply the nine Bradford-Hill factors to reach an admissible opinion on causation. Those factors are: "(1) temporal relationship, (2) strength of the association, (3) dose-response relationship, (4) replication of the findings, (5) biological plausibility, (6) consideration of alternative explanations, (7) cessation of exposure, (8) specificity of the association, and (9) consistency with other knowledge." Expert Admissibility Order at 12, D.E. 886 (citing *In re Deepwater Horizon*, 119 F.4th at 941).

#### *3. Expert Requirements for the Weight-of-the-Evidence Analysis*

"The weight-of-the-evidence method . . . , used alone or in conjunction with the Bradford Hill criteria, . . . involves a series of logical steps used to 'infer[] . . . the best explanation.'" Expert Admissibility Order at 12, D.E. 886 (quoting *In re Zoloft*, 858 F.3d at 795). The expert must "(l) identify an association between an exposure and a disease, (2) consider a range of plausible explanations for the association, (3) rank the rival explanations according to their plausibility, (4) seek additional evidence to separate the more plausible from the less plausible explanations, (5) consider all of the relevant available evidence, and (6) integrate the evidence using professional judgment to come to a conclusion about the best explanation." *Id.* at 13 (quoting *Milward v. Acuity Specialty Prods. Grp.*, 639 F.3d 11, 18 (1st Cir. 2011)). And, like the Bradford Hill method, the weight-of-the-evidence method requires the expert to "reliably establish an association in the first place" *before* determining whether the "association crosse[s] the line into causation." *Id.* (quoting *Davis v. Lockheed Martin Corp.*, 705 F. Supp. 3d 1345, 1349-51 (M.D. Fla. 2023) (excluding expert who incorporated statistically insignificant association studies into his weight-of-the-evidence method)).

#### *4. The CLJA Does Not Permit Experts to Reduce Their Level of Intellectual Rigor for Litigation.*

"[Plaintiff] claims that 'Congress wrote [the "at least as likely as not" standard] into federal law, and the experts were entitled to tailor their opinions to it." Expert Admissibility Order at 15, D.E. 886 (quoting D.E. 690 at 19, 22). The Court rejected this notion, stating simply and clearly: "Not so." *Id.* at 16. As the Court observed, "[b]y incorporating the CLJA's burden-of-proof standard into their methodology, rather than just their ultimate conclusion, an expert assumes the role of the factfinder and ignores Rule 702's requirement that expert testimony must be the product of reliable principles and the expert's opinion must reflect a reliable application of the principles

and methods to the facts of the case." *Id.* at 16-17. Thus, "Rule 702 does not permit experts to adjust for litigation their scientific methodology to mirror a legal standard" rather than "the standards of their fields." *Id.* at 16. Instead, an expert must "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field," *id.* at 16 (quoting *Kumho Tire Co.*, 526 U.S. at 152)). Accordingly, "a significant fact weighing against admitting the testimony is where . . . an expert developed [their methodology] expressly for the purposes of testifying." *Id.* (quoting *Wehling v. Sandoz Pharms. Corp.*, 162 F.3d 1158, at *3 (4th Cir. 1998) (per curiam) (unpublished table opinion)).

Moreover, "despite the [Plaintiffs'] arguments otherwise," an expert cannot "cure their methodological deficiency simply by stating that they hold their opinion 'to a reasonable degree of scientific certainty.'" *Id.* at 17. In short, "to the extent experts in this litigation premise their epidemiological conclusions on a reduced level of methodological rigor because this is a legal proceeding involving a claim where the burden of proof is equipoise, their opinion violates Rule 702." *Id.* (citing Fed. R. Evid. 702 and collecting cases).

### C. Vapor Intrusion is Not "Water at Camp Lejeune That Was Supplied By or On Behalf of the United States."

On December 1, 2025, this Court adopted Magistrate Judge Jones's July 15, 2025 Memorandum and Recommendation (M&R) "bar[ring] plaintiffs from introducing evidence or testimony on vapor intrusion to meet the causation burden in subsection 804(c) of the Camp Lejeune Justice Act." *In re Camp Lejeune Water Litig.*, No. 7:23-cv-897, 2025 WL 3452434, at *1 (E.D.N.C. Dec. 1, 2025). "Magistrate Judge Jones held that evidence and testimony on vapor intrusion falls outside the statute's language and is irrelevant to proving causation under subsection 804(c)). *Id.* at *2. The Court explained: "Vapors or emissions emanating from groundwater through soil into the buildings or environment at Camp Lejeune, by definition, do not originate

from 'water at Camp Lejeune, North Carolina, that was supplied by, or on behalf of, the United States.'" *Id.* at *4 (quoting CLJA § 804(b)). Thus, "[b]ecause the CLJA does not permit vapor intrusion claims, evidence on vapor intrusion and emissions at Camp Lejeune is irrelevant to a claimant's causation analysis under the CLJA." *Id.*

### D. Pursuant to the Plain Language of the CLJA, the United States is Entitled to Offsets as a Deduction from Any Award.

On June 5, 2026, this Court issued an Order interpreting the CLJA's offset provision, which provides in relevant part:

> (e).EXCLUSIVE REMEDY.—
>
> (1) IN GENERAL.— An individual, or 1egal representative of an individual, who brings an action under this section for a harm described in subsection (b), including a latent disease, may not thereafter bring a tort action against the United States for such harm pursuant to any other law.
>
> (2) HEALTH AND DISABILITY BENEFITS RELATING TO WATER EXPOSURE.—Any award made to an individual, or legal representative of an individual, under this section shall be offset by the amount of any disability award, payment, or benefit provided to the individual, or legal representative—
>
> (A) under—
>
> (i) any program under the laws administered by the Secretary of Veterans Affairs;
>
> (ii) the Medicare program under title XVIII of the Social Security Act (42 U.S.C.1395 et seq); or
>
> (iii) the Medicaid program under title XIX of the Social Security Act (42 U.S.C. 1396 et seq; and
>
> (B) in connection with health care or a disability relating to exposure to the water at Camp Lejeune.

Offset Order at 1-2, D.E. 885 (quoting CLJA § 804(e)).

The Court considered and rejected several arguments set forth by Plaintiffs to exclude certain offset evidence as "barred by subsection 804(e)(2), irrelevant under Rule 401, or outweighed under Rule 403." *Id.* at 4 (citations omitted). The Court recognized that, although "Congress created a new cause of action in the CLJA," such "cause of action is not boundless and

does not make every plaintiff-favorable limitation part of the statute." *Id.* at 12. Instead, "Congress chose to limit recovery through an express offset provision tied to '[a]ny award' and 'any' qualifying disability award, payment, or benefit." *Id.* (quoting CLJA § 804(e)(2)).

### ***1. The Court May Consider Future Offsets.***

This Court interpreted the CLJA's offsets provision to encompass future awards, payments, or benefits as offsets. The Court rejected Plaintiffs' argument to the contrary because there is no such "temporal limitation" in the CLJA. Offset Order at 5, 6, D.E. 885. The Court observed that past participles (like "provided to an individual") are "ambiguous, since they can 'refer to a completed event or describe the present state of the nouns they modify, depending on context.'" *Id.* (quoting *United States v. Hendrickson*, 949 F.3d 95, 98 (3d Cir. 2020)). Here, viewed in context, the Court held that "[t]he surrounding statutory text reinforces a tenseless reading." *Id.* at 6. "The CLJA states that the court 'shall' offset 'any' damages award with 'any' qualifying disability award, payment, or benefit." *Id.* (quoting CLJA § 804(e)(2)). "'Shall' is mandatory. 'Any' is expansive." *Id.* (citations omitted).

Accordingly, "subsection 804(e)(2) does not categorically bar evidence of future qualifying awards, payments, or benefits," and this Court may consider "any proposed future offset [that] is sufficiently certain and calculable." *Id.* (observing that "courts routinely assess future sums when calculating offsets and preventing double recovery" (citations omitted)).

### ***2. Offsets Apply to Any Award.***

This Court also rejected Plaintiffs' proposed "category-by-category offset scheme." Offset Order at 11, D.E. 885. Under such a scheme, offsets would "apply only against an equivalent category of damages," such that "a qualifying disability award, payment, or benefit may offset a CLJA award only up to the amount a plaintiff claims in a corresponding damages category." *Id.* at 10-11. However, according to "the 'plain and unambiguous' text" of the CLJA, the Court is

required to offset *any* award by the amount of *any* qualifying sum. *Id.* (citing *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002)). "Congress enacted an express and comprehensive offset provision," and "the [C]ourt must follow the CLJA as enacted." *Id.* at 11-12. Because Congress chose "award-level language," *id.*, offsets must be applied to "any award."

***3. Medical Expenses and Offsets are Distinct Matters of Proof.***

This Court also declined Plaintiffs' invitation to "assume away issues of proof" by assuming that "claimed damages and corresponding past medical expenses offsets for care paid by the VA, Medicare, or Medicaid and related to Camp Lejeune water exposure will necessarily 'match and zero out.'" Offset Order at 12-13, D.E. 885 (quoting D.E. 805 at 2). The Court held that it "will not impose additional . . . proof-collapsing limits Congress did not enact." *Id.* at 13. "Damages and offsets are distinct matters of proof." *Id.* "The possibility that the same medical expenses might be relevant to both inquiries does not relieve either side of its burden or make associated evidence categorically irrelevant or a waste of resources." *Id.* "Plaintiffs bear the burden of proving their damages. Defendant bears the burden of proving any statutory offset." *Id.* Accordingly, the Court declined to "categorically exclude evidence that might bear on the existence, amount, source, or qualification of past medical expenses," and "will resolve specific objections as raised at trial" as to the relevance and admissibility of such evidence. *Id.*

**II. <u>Contested Evidentiary Issues</u>**

The United States has raised objections to certain testimony proffered by Plaintiff's expert witnesses. "When a party challenges an expert's testimony, the court must 'satisfy itself that the proffered testimony meets the relevant standard as a precondition to admissibility.'" Expert Admissibility Order at 5, D.E. 886 (quoting *Snell v. Reid*, No. 22-1869, 2024 WL 2815061, at *3 (4th Cir. June 3, 2024) (per curiam) (unpublished) (cleaned up))). "The court must make explicit findings concerning the challenged preconditions of admissibility either by written order or orally

on the record." *Id.* (citing *Snell*, 2024 WL 2815061, at *3); *see also Nix v. Chemours Co. FC, LLC*, 805 F. Supp. 3d 626, 641 (E.D.N.C. 2025) (same).

The United States' motions on these objections, if decided before trial, would greatly reduce the number of issues before the Court at trial. The Parties' arguments are comprehensively addressed in the pending *Daubert* motions, summary judgment motions, and motions in limine. The United States incorporates the factual and legal authorities set forth in its filings in support of its pending motions, which are summarized below:

**Phase I – Water Modeling**

**A. The Court Should Exclude Expert Testimony Related to Use of ATSDR's Water Models to Determine Plaintiff's Individual Exposure Levels to Contaminants at Camp Lejeune.**

On December 12, 2025, the Court denied without prejudice the United States' Motion to Exclude Plaintiffs' Phase I Expert Testimony in Support of Using ATSDR's Water Models to Determine Exposure Levels for Individual Plaintiffs, stating that "[t]he court as factfinder will soon determine the Models' outer bounds for this litigation" and that, "[a]fter considering the evidence presented by the parties at the appropriate time, there may be Contaminant levels estimated by the Models that are presumptively unreliable, some that are sufficiently reliable, and some in between." *See* Dec. 12, 2025 Order at 54, D.E. 777.

As a public health agency, the Agency for Toxic Substances and Disease Registry (ATSDR) relied on conservative, health-protective assumptions and data-interpretation methods to develop the Camp Lejeune water models, resulting in higher estimated contaminant concentration levels over longer timeframes. The ATSDR's water modeling team acknowledged multiple times prior to litigation that the Camp Lejeune water models are not sufficiently accurate or reliable for use in litigation. Moreover, the paucity of actual historical contaminant concentration data precluded the ATSDR from robustly quantifying uncertainty in the Hadnot

Point-Holcomb Boulevard water models' simulated contaminant concentrations. Therefore, the United States' contemporaneously submits with this Memorandum a renewed motion to exclude expert testimony offered to support use of the Camp Lejeune water models in Plaintiff's case, and to preclude their use to determine either Plaintiff's exposure levels to contaminants in Camp Lejeune water or the contaminant concentration levels in Camp Lejeune water between 1953 and 1987.[3]

**Phase II – General Causation**

### B. The Court Should Exclude the General Causation Reports and Testimony of Experts Who Relaxed Their Methodologies Based on the CLJA's Modified Burden of Proof.

On July 1, 2026, this Court denied as moot the United States' Motion to Exclude Certain Plaintiffs' General Causation Experts' Testimony Utilizing The "At Least As Likely As Not" Standard on the basis that it was "resolved by entry of the [Expert Admissibility Order] DE 886 in the CLJA Master Docket." *See* July 1, 2026 Text Order (*Mousser*, Case No. 7:23-cv-667). However, an issue remains that this Court should now resolve with respect to Plaintiff's general causation experts in this case. *See* Expert Admissibility Order at 18, D.E. 886 ("Each judge individually will . . . determine admissibility and an appropriate remedy where needed, including for the remaining 702 motions in each case.").

After determining that the "relaxed burden of proof for *plaintiffs* pursuing CLJA claims does not relax admissibility requirements under Rule 702 to permit *experts* to depart from accepted standards in their field or permit courts to ignore Rule 702's requirements," Expert Admissibility Order at 15-16, D.E. 886 (emphasis added), the Court directed the Parties to "meet and confer regarding the appropriate way to implement [this order], including identifying the opinions to

---

[3] *See Mousser*, Case No. 7:23-cv-667, D.E. 106 (United States' motion).

which the [o]rder applies," *id.* at 18. The Parties met and conferred, but were unable to agree as to which general causation experts were subject to the Expert Admissibility Order. Plaintiff contends that none of his experts should be excluded. The United States contends that the general causation opinions proffered in this case by Dr. Steven Bird and Dr. Benjamin Hatten should be excluded. For the reasons below and set forth in the United States' briefing, this Court should exclude the expert testimony of Dr. Bird and Dr. Hatten pursuant to the United States' pending proposed order.[4]

#### *1. Dr. Steven Bird*

This Court ruled that it will "hold every expert in this litigation to [Rule 702's more likely than not standard] as applied to the expert's field and chosen method." Expert Admissibility Order at 17, D.E. 886. Dr. Bird admitted that he departed from the accepted standards of his field when using the "as likely as not" standard to reach his general causation opinions. He quoted the CLJA's "as likely as not" standard in his kidney cancer report, stating: "This standard has significant implications for the analysis at issue in this report. . . . The determination of a causal relationship is *naturally different* under a standard that requires a proof 'more likely than not,' as compared to a standard that requires a proof 'as likely as not.'" Bird GC Rep. (Kidney) at 6-7 (JA Ex. 83, D.E. 464-4) (emphasis added).

At his deposition, Dr. Bird testified that he was not aware of "any published guidelines on how to apply the 'as likely as not' standard to scientific evidence." Bird GC Dep. Tr. at 61:21-62:2

[4] *See* Master Docket Entries 539 (United States' motion); 540 (memorandum); 767 (reply); 890 (notice); 890-3 (proposed order). The United States reserves the right to challenge the admissibility of other PLG experts on this basis at trial depending on their testimony. The United States also challenged the admissibility of the general causation reports of Dr. Timothy Mallon and Dr. Michael Freeman, both of whom disclosed general causation reports on kidney cancer. However, Plaintiff did not include those experts on his Amended Pre-Trial Disclosures, so it appears that Plaintiff does not intend to call Dr. Mallon or Dr. Freeman at trial.

(JA Ex. 148, D.E. 469-2). He has never used the standard "equipoise and above" to describe scientific evidence in a published article or as an expert witness in litigation. *Id.* at 220:21-221:5. He admitted that "as likely as not" and "equipoise" is "kind of a legal term rather than a medical expert term." *Id.* at 220:21-223:5. Dr. Bird clearly "premise[d] [his] epidemiological conclusions on a reduced level of methodological rigor because this is a legal proceeding involving a claim where the burden of proof is equipoise . . . . [Therefore, his] opinion violates Rule 702." Expert Admissibility Order at 17, D.E. 886. This reason is sufficient to find that Dr. Bird's general causation testimony as to kidney cancer should be excluded.

Dr. Bird's general causation testimony is inadmissible because he improperly relied on associations that did not meet traditional statistical significance when conducting his Bradford-Hill and weight-of-the-evidence analyses. Dr. Bird believed that the CLJA's "as likely as not" burden of proof allowed him to change the definition of statistical significance. For example, Dr. Bird claimed that he evaluated adverse health effects and the Camp Lejeune water through consideration of the Bradford Hill 'considerations.'" Bird GC Rep. (Kidney) at 45 (JA Ex. 83, D.E. 464-4). However, Dr. Bird stated in his Bradford-Hill analysis that: "Strength of association is demonstrated by statistical significance. That is, an odds ratio for the occurrence of an adverse health effect in those exposed to Trichloroethylene ('TCE') water of greater than 1.1. The 1.1 amount is used here given the lower standard at issue, as described earlier, of 'as likely than not' or 'equipoise.'" *Id.* at 46. This is not the definition of statistical significance adopted by this Court. Rather, "association findings are 'considered "statistically significant" only when the odds ratio is expressed with a 95% confidence interval (consistently) and when that interval does not include an odds ratio of 1.0 or below.'" Expert Admissibility Order at 11, D.E. 886 (quoting *Smith*, 278 F.

Supp. 2d at 691 n.8). Dr. Bird's analysis of statistical significance lacks any consideration of the 95% confidence interval; he simply considers an odds ratio of greater than 1.1 to be sufficient.

#### *2. Dr. Benjamin Hatten*

Dr. Hatten stated in his kidney cancer report: "In the case of Camp Lejeune exposures, the standard for causation has been statutorily defined as either 'sufficient to conclude that a causal relationship exists' or 'sufficient to conclude that a causal relationship is at least as likely as not.' Such a change represents a *different and reduced causation standard* than typically assessed." Hatten GC Rep. (Kidney) at 3-4 (JA Ex. 90, D.E. 464-11) (emphasis added). He further stated that, although the "highest level of potential evidence for causation comes from human studies, either randomized control trials or epidemiological studies," "evidence obtained from animal and in vitro studies are sufficient to meet [the 'as likely as not'] standard." *Id.* at 4. Therefore, according to Dr. Hatten, "only the assumption of 'less likely than not' need be rejected to establish a causal link." *Id.* at 4-5. Significantly, Dr. Hatten also assumed that the CLJA's relaxed legal standard permitted him to forego the use of confidence intervals or statistical significance entirely, and he failed to even note the confidence intervals for results included in his report. *Id.* at 7 ("Of note, the ATSDR states that 'we did not use confidence intervals to determine whether a finding was 'statistically significant,' nor did we use significance testing to assess the evidence for causality."). He adopted ATSDR's reduced methodology stating, "For ease of discussion, the causation evaluation below utilizes the framework as promulgated by the ATSDR." Hatten GC Rep. (Kidney) at 6 (JA Ex. 90, D.E. 464-11).

As this Court held, the CLJA's phrase "as likely as not" "pertains to burdens of proof, not causation." *In re Camp Lejeune Water Litig.*, 736 F. Supp. 3d at 325. Therefore, Dr. Hatten was required to employ "the same level of intellectual rigor that characterizes the practice of an expert in [Dr. Hatten's] relevant field." Expert Admissibility Order at 16, D.E. 886 (quoting *Kumho Tire*

*Co.*, 526 U.S. at 152). Because Dr. Hatten impermissibly changed his causation methodology, using a "different lens for evaluating the total body of evidence," Hatten GC Dep. Tr. at 222:15-223:13 (JA Ex. 158, D.E. 469-12), his kidney cancer opinions should be excluded.

### C. The Court Should Exclude General Causation Testimony Related to PCE, Benzene, and Vinyl Chloride.

Should this Court decline to exclude Drs. Bird or Hatten under its Expert Admissibility Order, D.E. 886, it should exclude their opinions regarding PCE, benzene, and vinyl chloride, pursuant to Rule 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Specifically, these experts failed to identify statistically significant associations for PCE, benzene, and vinyl chloride at the levels allegedly present at Camp Lejeune. Thus, their applications of the Bradford Hill methodology are unreliable and their opinions regarding these three chemicals are inadmissible.[5]

The Court has held that, when conducting a Bradford Hill analysis, the expert must "find a statistically significant association at step one before moving on to apply the factors at step two." Expert Admissibility Order at 12, D.E. 886 (quoting *In re Lipitor*, 174 F. Supp. 3d at 924-25). The Court also held that the expert "must demonstrate the levels of exposure that are hazardous to human beings generally as well as the plaintiff's actual level of exposure." *In re Camp Lejeune Water Litig.*, 736 F. Supp. 3d at 320-21 (quoting *Nix v. Chemours Co. FC,* No. 7:17-CV-189, 2023 WL 6471690, at *8 (E.D.N.C. Oct. 4, 2023)).

Drs. Bird and Hatten identified limited studies showing a statistically significant association between kidney cancer and PCE, benzene, or vinyl chloride. But none of the studies satisfy the first step of the Bradford Hill analysis because they examined exposures that were much

[5] *See* Master Docket Entries 609 (United States' motion); 610 (memorandum); 761 (reply).

higher than those at Camp Lejeune or had disqualifying methodological limitations. Some studies are occupational studies with exposures orders of magnitude higher than those alleged at Camp Lejeune. Other studies are ecological studies, which cannot supply a qualifying association, or have disqualifying limitations recognized by the study's own authors. Moreover, as discussed below and in the United States' briefing, these experts ignored the multitude of more relevant and methodologically sound studies that contradict the few studies they cited in support of their opinions. Such failures render these experts' opinions unreliable and inadmissible. *See generally* D.E. 610 at 5-23.

### D. The Court Should Exclude the Reports and Testimony of Dr. Bird and Dr. Hatten for Conducting an Unreliable Literature Review.

The opinions of Drs. Bird and Hatten are also unreliable and therefore inadmissible because these experts conducted an unreliable literature review in support of their opinions. As set forth in the United States' briefing, Plaintiffs' own expert, Dr. David Savitz, explained at length what constitutes a reliable—or unreliable—review of epidemiological literature. *See* D.E. 575 at 2-4.[6] The literature reviews supporting the opinions of Drs. Bird and Hatten are unreliable and therefore inadmissible on the following grounds.

#### *1. The Experts Utilized Unreliable Methodologies to Obtain the Landscape of Relevant Literature.*

Drs. Bird and Hatten failed to provide complete descriptions of their search methodologies, including comprehensive lists of their search terms and protocols for including or excluding studies from their searches. For example, Dr. Bird failed to follow the comprehensive and transparent search methodology that he had used for a recently published article. The methodologies these experts utilized in their reports for the CLJA litigation sharply contrast with the methodologies

[6] *See* Master Docket Entries 574 (United States' motion); 575 (memorandum); 768 (reply).

they use in their academic, non-litigation work. This renders their testimony unreliable and inadmissible. *See generally* D.E. 575 at 10-14.

#### ***2. The Experts Cherry-Picked the Few Studies Supporting Their Conclusions.***

Drs. Bird and Hatten also cherry-picked studies suggesting a statistically significant association between kidney cancer and the chemicals at issue at occupational levels, while ignoring a host of studies and reviews showing no such association, including reviews conducted by the National Academy of Sciences (NAS), the National Toxicology Program (NTP), and the International Agency for Research on Cancer (IARC). They provided no explanation for why they excluded unfavorable studies and reviews—in fact, they did not even mention these agency reviews in their reports. By failing to even acknowledge the vast majority of studies and reviews showing that "the relevant scientific literature contains evidence tending to refute [their] theory," each of these experts "fail[ed] to account for contrary scientific literature," which renders their opinions unreliable and inadmissible. D.E. 575 at 20 (quoting *Yates v. Ford Motor Co.*, 113 F. Supp. 3d 841, 858 (E.D.N.C. 2015). *See generally* D.E. 575 at 14-22.

#### ***3. The Experts Ignored Numerous Study Limitations.***

Drs. Bird and Hatten also skipped an important step during their analyses of the scientific literature—they failed to consider important study limitations recognized by the studies' authors. *See, e.g.*, *Rhyne v. United States Steel Corp*., 474 F. Supp. 3d 733, 746–47 (W.D.N.C. 2020) (experts may not "reach[] conclusions that the authors of the study did not make"). These experts selectively cited studies as supporting causation, even where the studies' authors failed to reach—or even expressly disclaimed—causation. For example, they both cited IARC and NTP findings of some evidence of causation between TCE and kidney cancer but failed to address IARC's and NTP's *lack* of kidney cancer-specific findings with PCE, vinyl chloride, or benzene. They also

ignored study limitations, inconsistent results, absence of exposure-response data, and confounding factors. These omissions, along with many others described in the United States' briefing, are fatal to the admissibility of their opinions. *See generally* D.E. 575 at 22-27.

#### ***4. The Experts Cherry-Picked Results Within Studies.***

Finally, Drs. Bird and Hatten cherry-picked findings within studies that supported their ultimate opinions while ignoring findings *in those same studies* that contradicted their opinions. They also reported risk estimates (or Hazard Ratios (HR)) for certain exposure durations that supported their opinions, while ignoring and omitting altogether the risk estimates in the same analysis for other exposure durations that contradicted their opinions and/or indicated a lack of exposure-response relationship. By doing so, they impermissibly took values out of context and failed to acknowledge the lack of a dose-response relationship demonstrated in context—a quintessential example of cherry-picking. *See generally* D.E. 575 at 27-30.

### E. The Court Should Exclude Expert Testimony Regarding *trans*-1,2-Dichloroethylene.

The United States moved for partial summary judgment on all claims alleging that *trans*-1,2-dichloroethylene (DCE) caused a Track 1 Illness because Plaintiff failed to present any expert opinion testimony that DCE, alone or as part of a mixture, can cause any of the Track 1 illnesses.[7] Plaintiffs have made clear that they "do[] not, and will not, take the position in the Track 1 bellwether cases that DCE, ***as a stand-alone chemical***, is the cause of the Track 1 bellwether Plaintiffs' diseases." D.E. 715 at 1 (emphasis in original). Instead, Plaintiffs argue that "DCE is relevant to this case and cannot be removed from the equation" because DCE is "part of the chemical soup, the TVOCs, to which the Plaintiffs were exposed." *Id.* at 2.

---

[7] *See* Master Docket Entries 520 (United States' motion); 521 (memorandum); 522 (statement of material facts); 742 (reply).

Aside from barely even mentioning DCE in their expert reports, Plaintiff's kidney cancer experts failed to cite any admissible evidence supporting a conclusion that DCE, as "part of the chemical soup," can cause any Track 1 disease, including kidney cancer. D.E. 715 at 2. Because Plaintiff's kidney cancer experts, Drs. Bird and Hatten, fail to proffer any opinions that DCE, either alone or as part of a mixture, can cause kidney cancer, the United States is entitled to partial summary judgment regarding DCE.

**Phase III – Specific Causation**

### F. The Court Should Exclude the Improper Differential Diagnosis Opinions of Plaintiff's Specific Causation Experts Dr. Joseph Del Pizzo and Dr. Armine Smith.

Dr. Joseph Del Pizzo and Dr. Amine Smith authored specific causation opinions regarding Plaintiff's UTUC, diagnosed in 2020, and his subsequent bladder cancer diagnosis.[8] Although both experts purported to use a differential diagnosis methodology to reach their specific causation opinions, they failed to consider the idiopathic causes and background risks. Instead, as discussed in the United States' briefing, they both excluded idiopathy and ignored background incidence based solely on Plaintiff's alleged exposure to contaminated water at Camp Lejeune.[9]

In a proper differential diagnosis, a physician "rules in" all potential causes and then systematically "rules out" each, leaving behind the most likely cause. To satisfy *Daubert* and Rule 702, the expert must take serious account of other potential causes for the disease and reliably rule them out. And, while an expert need not rule out all possible alternative causes, an expert must at least consider other potential causes. *See generally* D.E. 570 at 4-6. Diseases that present without

---

[8] *See* Del Pizzo Rep. (Mousser) (JA Ex. 386, D.E. 491-10); Del Pizzo Suppl. Rep. (Mousser) (JA Ex. 387, D.E. 491-11); Smith Rep. (Mousser) (JA Ex. 412, D.E. 493-3); Smith Suppl. Rep. (Mousser) (JA Ex. 413, D.E. 493-4).

[9] *See* Master Docket Entries 569 (United States' motion); 570 (memorandum); 759 (reply).

identifiable causes are "of unknown cause" or "idiopathic." When there are many idiopathic cases of a particular disease, it is impossible to ignore and difficult to rule out the possibility of idiopathy. *See id.* at 6-7. Moreover, idiopathy often arises from the overall background risks for a disease that everyone faces.

Drs. Del Pizzo and Smith admit that kidney cancer is largely an idiopathic disease. *See, e.g.*, Del Pizzo Dep. Tr. at 82:15–23 (JA Ex. 589, D.E. 507-10)) ("[T]he majority of kidney cancer diagnoses are such where no identifiable risk factor is found."); *id.* at 84:1–7 (agreeing that cancer-causing mutations can occur randomly); Smith Dep. Tr. at 72:19–74:6 (JA Ex. 597, D.E. 508-6) (estimating that "maybe 70 percent[]" of her kidney cancer patients "have no predisposing risk factors for kidney cancer"); *id.* at 219:16–22 (mutations causing cancer "can be caused by an exogenous factor like a carcinogen exposure," or "they can also occur randomly or sporadically"). Yet, they failed to consider idiopathy or background risk as a potential cause of Plaintiff's cancer because they determined that the presence of *any* risk factor (such as Plaintiff's presence at Camp Lejeune) necessarily "ruled out" idiopathy and background risk. *See* Del Pizzo Rebuttal at 1 (JA Ex. 388, D.E. 491-12) (opining that idiopathy is reserved for cases where there are "no identifiable risk factors or causes"); Smith Rebuttal Rep. at 2 (JA Ex. 415, D.E. 493-6). By doing so, Drs. Del Pizzo and Smith engaged in an unreliable methodology under *Daubert* and Rule 702 because they failed to take serious account of other potential causes. Accordingly, their specific causation opinions are inadmissible.

**G. The Court Should Grant the United States' Motion for Summary Judgment in This Matter.**

As discussed above and in the United States' briefing, the expert testimony Plaintiff proffers in this action is unreliable regarding two critical issues: (1) general causation regarding whether PCE, vinyl chloride, and benzene can cause Mr. Mousser's cancer; and (2) specific

causation. The United States moved for summary judgment because, without reliable expert testimony, Plaintiff is "unable to satisfy the general causation element as to PCE, vinyl chloride, and benzene and the specific causation element." D.E. 611 at 1-2. The United States' motion, currently held in abeyance, *see* D.E. 818, should now be granted for the reasons stated above and in the United States' briefing.[10]

## III. Anticipated Legal and Evidentiary Issues

### A. Non-Track 1 Diseases

In selecting Track 1 Trial Plaintiffs like Mr. Mousser, Plaintiffs' Leadership Group (PLG) agreed, and the Court ordered, that Track 1 Trial Plaintiffs would consist only of plaintiffs alleging that they suffered Track 1 illnesses allegedly caused by exposure to contaminated water at Camp Lejeune, along with any injuries or conditions stemming from a Track 1 illness or its treatment (collectively, "Track 1 Illnesses"). *See* June 10, 2024 Order, D.E. 232. PLG further agreed, and the Court ordered, that Track 1 Trial Plaintiffs, including Mr. Mousser, waived their rights to allege that any illnesses or injuries besides Track 1 Illnesses were caused by exposure to contaminated water at Camp Lejeune (collectively, "non-Track 1 Illnesses"). *See* July 9, 2024 Order, D.E. 250. Track 1 Trial Plaintiffs like Mr. Mousser failed to disclose expert testimony to support that non-Track 1 Illnesses were caused by exposure to contaminated water at Camp Lejeune or that their non-Track 1 Illnesses are secondary to their Track 1 Illnesses.

Nevertheless, the United States anticipates that Mr. Mousser may attempt to offer evidence or argument related to claims that non-Track 1 Illnesses were caused by exposure to contaminated water at Camp Lejeune. Accordingly, the United States submits contemporaneously with this

[10] *See* Master Docket Entries 611 (United States' motion); 615 (memorandum); 617 (statement of material facts); 766 (reply).

Memorandum a motion in limine to exclude any and all evidence or argument relating to claims that non-Track 1 Illnesses, which Mr. Mousser waived and failed to support with expert testimony, were caused by exposure to contaminated water at Camp Lejeune.[11] Such evidence or argument is irrelevant to the critical question in Mr. Mousser's case—whether exposure to contaminated water at Camp Lejeune caused his cancer. Any probative value of evidence and argument relating to claims that non-Track 1 Illnesses were caused by exposure to contaminated water at Camp Lejeune is substantially outweighed by the danger of undue delay and wasting time.

### B. The Court Should Preclude Plaintiff's Specific Causation Experts Dr. Joseph Del Pizzo and Dr. Armine Smith From Offering General Causation Testimony.

Dr. Joseph J. Del Pizzo and Dr. Armine K. Smith improperly included general causation opinions in the specific causation reports they authored in Plaintiff's case. Specifically, Drs. Del Pizzo and Smith stepped outside of their designated lane as specific causation experts to offer general causation opinions—i.e., that there is a causal relationship linking exposure to TCE, PCE, vinyl chloride and benzene at Camp Lejeune to kidney cancer and/or UTUC.

On July 22, 2025, this Court held that "Plaintiffs' Phase III experts may not introduce new, independent general causation analyses, including but not limited to fresh literature reviews, . . . or any general causation methodologies that were not timely disclosed in Phase II." *In re Camp Lejeune Water Litig.*, No. 7:23-CV-00897, 2025 WL 2054353, at *4 (E.D.N.C. July 22, 2025). Yet, this is precisely what Drs. Del Pizzo and Smith did in their Phase III expert reports. They conducted fresh literature reviews and arrived at new, independent general causation analyses. Accordingly, for the reasons more fully discussed in the United States' motion in limine filed

[11] *See Mousser*, Case No. 7:23-cv-667, D.E. 107 (United States' motion); 108 (memorandum).

simultaneously herewith, Drs. Del Pizzo and Smith should be precluded from testifying about their general causation opinions at trial.[12]

### C. The United States Reserves the Right to Raise Additional Legal or Evidentiary Issues.

The United States reserves the right to argue or brief any other legal or evidentiary issues that arise during the course of the trial on this matter.

[12] *See Mousser*, Case No. 7:23-cv-667, D.E. 104 (United States' motion); 105 (memorandum).

Dated: October 19, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

JONATHAN D. GUYNN
Deputy Assistant Attorney General
Torts Branch

BRIDGET BAILEY LIPSCOMB
Chief
Camp Lejeune Justice Act Section

HAROON ANWAR
SARA J. MIRSKY
Assistant Directors

ADAM BAIN
Chief Litigation Counsel

*/s/ Jennifer E. Adams*
JENNIFER E. ADAMS
Virginia Bar No. 80149
Trial Attorney
United States Department of Justice
Civil Division, Torts Branch
Camp Lejeune Justice Act Section
1100 L Street, NW
Washington, DC 20005
(202) 702-4998
jennifer.e.adams@usdoj.gov

Attorney inquiries to DOJ regarding CLJA:
(202) 353-4426

*Attorneys for Defendant,*
*United States of America*

## CERTIFICATE OF SERVICE

I hereby certify that on October 19, 2026, I electronically filed the foregoing using the Court's Electronic Case Filing system, which will send notice to all counsel of record.

*/s/ Jennifer E. Adams*
JENNIFER E. ADAMS