**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA SOUTHERN DIVISION**
**7:23-CV-00667**

| | | |
|---|---|---|
| **Frank Mousser,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **DEFENDANT UNITED STATES' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| **v.** | ) | |
| | ) | |
| **United States of America,** | ) | |
| | ) | |
| **Defendant.** | ) | |

The United States submits these Proposed Findings of Fact and Conclusions of Law pursuant to Local Civil Rule 52.1.[1]

## FINDINGS OF FACT

### I. Background on Camp Lejeune

1. United States Marine Corps Base Camp Lejeune (Camp Lejeune) is a military base operated by the United States, located outside of Jacksonville, in Onslow County, North Carolina. The base is located on the coast of the Atlantic Ocean, with approximately 11 miles of usable shoreline, and currently occupying approximately 156,000 acres (244 square miles) in total.
2. The United States owned, operated, and managed Camp Lejeune between August 1, 1953, and December 31, 1987, by and through the Navy and Marine Corps.

[1] To the extent a Finding of Fact should be a conclusion of law, it is incorporated into the Conclusions of Law. To the extent a Conclusion of Law should be a Finding of Fact, it is incorporated into the Findings of Fact.

3. Between 1953 and 1987, the Camp Lejeune Military Reservation occupied an area of approximately 110,000 acres (including 2,772 acres that encompasses Marine Corps Air Station New River).

4. Nine water distribution systems supplied water at Camp Lejeune between 1953 and 1987: Hadnot Point, Tarawa Terrace, Holcomb Boulevard, Camp Geiger, Camp Johnson (also known as Montford Point), Courthouse Bay, Marine Corps Air Station New River, Onslow Beach, and Stone Bay Rifle Range (also known as Rifle Range).

## II. Water Contamination at Camp Lejeune and ATSDR's Camp Lejeune Water Models

5. The Hadnot Point Industrial Area and the Hadnot Point Landfill were the sources of contamination of groundwater wells connected to the Hadnot Point Water Treatment Plant.

6. In 1982, trichloroethylene (TCE), a degreasing agent, was first discovered in water at the Hadnot Point Water Treatment Plant on Camp Lejeune.

7. In 1984, the source of TCE at the Hadnot Point Water Treatment Plant was identified as contaminated groundwater affecting a limited number of water supply wells.

8. In 1984 and 1985, small amounts of benzene, a component of fuel, and the TCE degradation by products perchloroethylene (PCE), 1,2-trans dichloroethylene (DCE), and vinyl chloride were also discovered in a limited number of wells supplying the Hadnot Point Water Treatment Plant.

9. The contaminated wells supplying the Hadnot Point Water Treatment Plant were all taken out of service by February 4, 1985.

10. As a public health agency, the Agency for Toxic Substances and Disease Registry (ATSDR) is required to complete a Public Health Assessment (PHA) on each site on the National Priorities List.

11. The ATSDR's 1997 PHA of Camp Lejeune recommended completing an epidemiological study on specific birth defects and cancer in children who were exposed in utero to water at Camp Lejeune.

12. To provide exposure data for ATSDR's epidemiological study, ATSDR undertook efforts to develop computerized water models to estimate monthly contaminant concentration levels in drinking water at Camp Lejeune decades into the past because real-world historical concentration data from Camp Lejeune is limited to relatively few samples taken between 1982 and 1985.

13. ATSDR constructed two water models that each simulated monthly mean contaminant concentrations at a water treatment plant.

14. The first water model simulated monthly average, or mean, contaminant concentration data at Tarawa Terrace Water Treatment Plant and was completed in 2009.

15. The second water model simulated monthly mean contaminant concentration data at Hadnot Point Water Treatment Plant and another system to which it occasionally supplied supplemental water, Holcomb Boulevard, and was completed in 2013.

16. The ATSDR's water model for Hadnot Point Water Treatment Plant simulated monthly mean contaminant concentrations beginning in 1942, meaning it simulated concentrations over a nearly 40-year period into the past for which there is no historical concentration data.

17. It is unknown when the subsurface aquifers and water supply wells at Hadnot Point became contaminated.

18. Because the dates of contamination of the water supply for Hadnot Point were unknown, ATSDR conservatively estimated early start dates for contaminant releases and assumed in its models that contamination immediately reached the aquifer at Camp Lejeune and continued entering the aquifer at a constant rate.

19. Contaminants likely entered the subsurface (i.e., soil) at varying rates depending on when historical releases occurred.

20. The Hadnot Point water supply wells were cycled on and off to supply water to the water treatment plant so the few contaminated wells were only periodically supplying contaminated water; however, records of daily well cycling data is available for only a few months in late 1984 and early 1985.

21. To simulate the operation of the Hadnot Point water supply wells and their impact on groundwater flow and the movement of contamination in the aquifer, ATSDR had to create pumping schedules for the water supply wells.

22. The ATSDR developed pumping schedules for its model using complex calculations and very limited historical data.

23. Given the chemical and physical properties of the contaminants, a certain percentage of contaminants would be lost through volatilization to the air and other processes during water storage and treatment.

24. However, ATSDR's water models did not account for contaminant losses during water storage and treatment and assumed that any contaminants that reached the Hadnot Point Water Treatment Plant remained in the water after treatment and storage.

25. The paucity of historical data led the ATSDR to conclude that there was insufficient data to statistically assess how well the simulated contaminant concentrations from the models fit the historically observed contaminant concentrations detected through analytical analysis of water samples.

26. The ATSDR concluded that determining the actual historic concentrations likely present in the water was not necessary because "[a] successful epidemiological study places little emphasis on the actual (absolute) estimate of concentration and, rather, emphasizes the relative level of exposure[.]"

27. The ATSDR acknowledged that it was "not the goal of the ATSDR health studies to infer which health effects occur at specific . . . concentrations[.]"

28. The ATSDR informed the public that its "exposure estimates [from the simulated monthly mean contaminant concentrations at Hadnot Point] cannot be used alone to determine whether you, or your family, suffered any health effects as a result of past exposure to TCE-contaminated drinking water at USMCB Camp Lejeune."

29. The ATSDR informed the public that "the available data are not specific enough to accurately estimate daily levels of VOCs (PCE, TCE,1,2-tDCE, VC, and benzene) in the Hadnot Point-Holcomb Boulevard (HPHB) study area."

30. The ATSDR's water models have been widely criticized by other water modelers for misleadingly suggesting that it was possible to accurately and precisely estimate historical contaminant concentrations during periods when no contaminant concentrations were measured.

## III. Plaintiff Mousser's Presence on Camp Lejeune and Claimed Injury

31. Plaintiff Frank Mousser was stationed at Camp Lejeune from October 18, 1982, to September 7, 1986. During this time, Mr. Mousser spent significant time away from Camp Lejeune for deployments, trainings, and medical treatment. While at Camp Lejeune, he resided and worked in the French Creek area within Hadnot Point.

32. While deployed in November 1983, Mr. Mosser experienced gross hematuria, or visible blood in his urine. Mr. Mousser's cystoscopies in 1983 and 1984 were normal, and he was not diagnosed with a malignancy at this time.

33. Mr. Mousser's urine showed microscopic hematuria periodically from 1984 through 2013.

34. Mr. Mousser again experienced gross hematuria in 2013. Plaintiff was not diagnosed with a malignancy at this time.

35. Mr. Mousser experienced gross hematuria again in September 2017. Plaintiff was not diagnosed with a malignancy at this time.

36. Mr. Mousser experienced gross hematuria and flank pain in June and July 2020. Plaintiff's medical providers found a 3.7 cm mass on his right kidney on August 25, 2020.

37. Mr. Mousser was diagnosed with non-invasive papillary urothelial carcinoma, or upper tract urothelial carcinoma (UTUC) in September 2020. He underwent a successful right robotic assisted laparoscopic radical nephroureterectomy with gemcitabine bladder installation on October 20, 2020. This procedure included the removal of his right kidney, ureter, and bladder cuff.

38. On October 28, 2024, Mr. Mousser's providers found a prostatic polyp on or around his bladder during a cystoscopy.

39. Mr. Mousser's prostatic polyp was removed via cystoscopy on January 31, 2025. Pathology results showed that the prostatic polyp was low-grade papillary urothelial cell carcinoma. The Parties agree that this malignancy constitutes a recurrence of the 2020-diagnosed UTUC.

40. Mr. Mousser has not been diagnosed with any other carcinoma since January 31, 2025.

41. After his October 20, 2020, nephroureterectomy, Mr. Mousser was diagnosed with chronic kidney disease ("CKD"). CKD arises when decreased renal function—that is, the kidneys' ability to filter blood—exists for three months or more. CKD is divided into stages of severity according to kidney function. There are five stages of CKD (G1 to G5) based on the kidney' ability to filter blood, with stage 3 (G3) divided between G3a and 3b. Patients with G1 have the closest to normal kidney function, and patients with G5 have the worst kidney function.

42. These stages are further subdivided into A1 to A3 based on the amount of protein in the urine, with A1 representing minimal to no proteins in the urine and A3 representing significant levels of proteins in the urine. CKD stage is significant in determining a patient's prognosis.

43. Mild to moderate CKD is quite common in the general population, as most people lose kidney function with age. Because mild to moderate CKD has no symptoms, up to 90% of adults with CKD are not aware they have it. Even with severe CKD (stages 4 and 5), 30% of adults are not aware they have kidney disease due to lack of symptoms. These more severe stages of CKD are less common than milder stages because kidney disease tends to progress very slowly and does not reach higher stages before someone reaches the end of life.

44. Since January 2022, Plaintiff has exhibited stable CKD Stage 3a A1, a mild form of this condition.

45. Mr. Mousser's prognosis is excellent, and it is unlikely that he will need dialysis or a kidney transplant. He is most likely cured of his cancer, and the consequences of his nephroureterectomy have not led to any significant impacts on his kidney function, nor has it materially impacted the risk of future renal dysfunction.

46. In terms of his future medical care, Mr. Mousser will reasonably require additional urology visits, cystoscopies, and CT scans. Mr. Mousser experienced a recurrence of urothelial cancer, which was successfully treated.

47. Mr. Mousser's upper tract urothelial cancer will not affect his overall life expectancy.

## IV. Plaintiff Mousser's Unrelated Medical Issues

48. Mr. Mousser has a myriad of additional unrelated medical issues, including, but not limited to: (1) cardiovascular conditions, including coronary artery disease, hypertension, and peripheral artery disease; (2) mental health conditions, including adjustment disorder and major depressive disorder; (3) significant left knee, neck, and back pain that radiates down his legs due to a diagnosed degenerative meniscus of left knee, chronic axial cervical and lumbar pain with radiculopathy; (4) severe obstructive sleep apnea; (5) insomnia and fatigue; (6) pre-diabetes or diabetes mellitus type II; (7) erectile dysfunction; (8) hyperlipidemia; (9) overactive bladder; (10) nocturia; (11) Chronic Pain Syndrome; (12) Uncomplicated Opioid Dependence; and (13) tinnitus.

49. Regarding his cardiovascular issues, Mr. Mousser had stents placed in his heart in 2012 and had a quadruple bypass surgery in 2016, years before his cancer diagnosis.

50. Mr. Mousser's musculoskeletal pain is the result of a motor vehicle accident in the 1990s. He has taken, and currently takes, opioid medications to treat his pain.

51. None of Mr. Mousser's comorbidities (conditions referenced in Finding 48) are related, directly or indirectly, to his exposures to water at Camp Lejeune. The vast majority of these conditions either predate Mr. Mousser's cancer diagnosis or are not claimed by Mr. Mousser to be associated, directly or indirectly, with his alleged exposures to contaminated water at Camp Lejeune.

52. Mr. Mousser's mental health conditions are related to his early childhood experiences and family life generally; his experiences in the military, including combat; his comorbidities; and his job dynamic before retiring.

53. Mr. Mousser's comorbidities are stable. However, these comorbidities and the symptoms related to them – in addition to the work dynamics at his last job – preclude him from working.

54. Mr. Mousser currently takes medication for his comorbidities that are protective of his kidney function.

## V. General Causation: The Contaminants in the Camp Lejeune Water Are Not Capable of Causing Mr. Mousser's Cancer.

55. Mr. Mousser cannot establish general causation between exposure to water at Camp Lejeune and UTUC.

56. The epidemiological literature does not show that contaminated water at Camp Lejeune can cause UTUC.

57. The ATSDR Camp Lejeune epidemiology studies do not support a causal relationship between exposure to the chemicals in the Camp Lejeune water and urothelial cancer, kidney cancer, or bladder cancer.

58. The most recent ATSDR epidemiological study, a 2024 cancer incidence study titled *Cancer Incidence among Marines and Navy Personnel and Civilian Workers Exposed to Industrial Solvents in Drinking Water at US Marine Corps Base Camp Lejeune: A Cohort Study*, failed to find any statistically significant relationships between exposure to the Camp Lejeune water and urothelial cancer, kidney cancer, or bladder cancer. The study compared a cohort of 154,821 Marines and Navy personnel who were stationed at Camp Lejeune between 1975 and 1985 to a cohort of 163,484 marines and Navy personnel who were stationed at Camp Pendleton during the same time period. The analysis failed to find any statistically significant differences in urothelial cancer, bladder cancer, or kidney cancer, when controlling for race, age, and sex.

59. Other Camp Lejeune epidemiological studies that looked at mortality likewise failed to find any statistically significant differences between Camp Lejeune and Camp Pendleton cohorts for Marines or Navy personnel for kidney and renal pelvis cancer, kidney cancer, or urinary bladder cancer.

60. There is insufficient scientific evidence to support a causal relationship between exposure to any of the individual chemicals in the water at Camp Lejeune and urothelial cancer, bladder cancer, or kidney cancer at the environmental levels that were present at Camp Lejeune.

61. Of the chemicals detected in the Camp Lejeune water, the scientific evidence only supports a causal connection between TCE and kidney cancer, but only at occupational exposure

levels that were much higher than the environmental levels present at Camp Lejeune. The established scientific literature does not support a causal association between PCE, DCE, benzene, and vinyl chloride at any level.

62. The opinions of Mr. Mousser's experts that there is sufficient evidence of a causal relationship between chemicals in water at Camp Lejeune and UTUC, bladder cancer, or kidney cancer are methodologically flawed and unsupported by science. The cherry-picked studies that Plaintiff's experts cite fail to find statistically significant relationships, are methodologically flawed, or do not involve environmental levels of chemicals that are similar to the levels present at Camp Lejeune.

63. Scientists employ "Bradford Hill" considerations to determine whether relationships between chemical exposures and a disease may support an inference of causation. There is no relevant statistically significant association between contaminated Camp Lejeune water – or any of the individual chemicals in the Camp Lejeune water at environmental levels – and urothelial cancer, bladder cancer, or kidney cancer to begin the Bradford Hill analysis.

64. Even if such an association existed, the Bradford Hill analysis would not support an inference of causation. In particular, there are no strong associations, consistent associations, or dose-response relationships that would support an inference of causation under the Bradford Hill analysis.

## VI. Specific Causation: The Contaminants in the Camp Lejeune Water Did Not Cause Mr. Mousser's Cancer.

65. Mr. Mousser cannot establish specific causation for his alleged Camp Lejeune water exposure. Specific causation is determined through a differential etiology, which is a

standard scientific technique of identifying the cause of a medical problem. It is generally accomplished by determining the possible causes for the patient's symptoms and then eliminating each of these potential causes until reaching one that cannot be ruled out or determining which of those that cannot be excluded is the most likely.

66. Mr. Mousser's Camp Lejeune water exposure cannot be considered as a possible cause of his cancer because general causation cannot be established for his exposure to the Camp Lejeune water or any of the specific chemicals detected in the Camp Lejeune water at the levels present. Therefore, it does not qualify as a possible cause for Mr. Mousser's cancer under the differential etiology technique.

**A. Mr. Mousser's Cancer Type**

67. Mr. Mousser experienced UTUC. UTUC accounts for approximately 10% of all cancers arising in the kidneys. Compared to renal cell carcinomas, UTUCs arise in different parts of the kidney; have different causes or risk factors; have different treatment plans; and have different prognoses.

68. UTUC arises in the renal pelvis, which is the internal portion of the kidney, and in the ureter, which is the tube connecting the kidney to the bladder. More specifically, UTUC arises in the urothelial cells of the renal pelvis and ureter, which are specific cell types lining these two structures, and are distinct from the cell types involved in other kidney cancers.

69. Prognosis and survival after a diagnosis of UTUC is highly dependent on the stage. Staging is based on both extent and size of the tumor, presence of spread to lymph nodes, and presence of metastatic disease. Mr. Mousser had Stage 1 UTUC, which has a 95% cure rate.

**B. Risk Factors for Mr. Mousser's Cancer Type**

70. Smoking is associated with approximately 50% of all urothelial cancers and is the most significant risk factor for these cancers. Notably, an elevated risk persists even in smokers who have quit more than 10 years previously.

71. Chronic infection or inflammation is also a risk factor for many cancers and is particularly relevant for urothelial cancers.

**C. The Specific Cause of Mr. Mousser's Cancer**

72. Mr. Mousser's UTUC was most likely caused by a combination of his smoking habit and chronic inflammation. Even if exposure to contaminated water at Camp Lejeune could be considered a possible cause, Mr. Mousser's UTUC was unlikely caused by that exposure to water at Camp Lejeune. In fact, aside from smoking and chronic inflammation, it is more likely that Mr. Mousser's cancer was idiopathic or unknown in origin than caused by a toxic exposure.

## VII. Mr. Mousser's Damages and Offsets *If* Causation Were Established

**A. Mr. Mousser's Damages**

73. Mr. Mousser presently seeks the value of past lost household services, loss of earning capacity, and the present value of future medical care.

74. There is insufficient evidence as to what household services Mr. Mousser was unable to perform after he was diagnosed with the medical conditions he asserts are related to Camp Lejeune water.

75. There is insufficient evidence that Mr. Mousser ceased working or retired prematurely due to the medical conditions he asserts are related to Camp Lejeune water. Consequently, he

has not incurred any lost earnings or lost earning capacity as it relates to medical conditions he asserts are related to Camp Lejeune water.

76. Mr. Mousser voluntarily resigned from his automotive salesperson position in 2023 at age 60 for reasons unrelated to his cancer.
77. Mr. Mousser's cancer did not prevent him from working as an automotive salesperson.
78. Mr. Mousser's treating physicians confirm that Mr. Mousser's cancer diagnosis, treatment, and resulting chronic kidney disease did not preclude him from working.
79. Mr. Mousser's former employer confirms that Mr. Mousser could perform the physical and mental requirements of his job as an automative salesperson. Mr. Mousser never expressed to his employer that medical issues were the reason for his voluntary resignation.
80. Mr. Mousser has medical conditions unrelated to his cancer that independently affect his ability to perform certain work activities, including musculoskeletal problems that impair his neck and lower back functioning, diabetes with neuropathy in his extremities, and cardiac problems. Further, these unrelated comorbidities—such as severe obstructive sleep apnea, tinnitus, diabetes and resulting nocturia, and musculoskeletal pain—significantly impact his ability to sleep. Mr. Mousser informed his medical providers that he had to quit working because he was falling asleep all the time. Mr. Mousser's musculoskeletal conditions limit his ability to walk or stand for extended periods of time, bear weight, and reposition. These activities are required for an automobile salesperson position.
81. With respect to his cancer, Mr. Mousser reasonably requires one additional urologist follow-up; a cystoscopy once every six to twelve months until January 2029 and then annually until 2030; and a one-time CT scan of his bladder.

### B. Mr. Mousser's Offsets

82. Mr. Mousser has received health care and disability benefits related to his claimed medical conditions through the Department of Veterans Affairs.

83. The Department of Veterans Affairs operates through three major organizational administrations: the Veterans Health Administration (VHA), the Veterans Benefits Administration (VBA), and the National Cemetery Administration (NCA).

84. The VHA is a branch of the Department of Veterans Affairs and is an integrated health care system, which provides health care to eligible Veterans and other eligible beneficiaries at over one thousand facilities nationally.

85. VHA's activities are primarily funded through annual Congressional appropriations which are from the general fund (i.e., general taxpayer revenues and federal borrowing). Since its creation, Congress has historically provided VHA with funding to meet projected demands. Congress has not constricted eligibility for care through VHA since its establishment.

86. Veterans who served on active duty at Camp Lejeune for 30 days or more between August 1, 1953, and December 31, 1987, are eligible for enrollment in VHA. Enrolled veterans are eligible for hospital care and medical services under the VHA medical benefits package. Veterans who served at Camp Lejeune during the applicable time period are exempt from any VA copayment requirements for hospital care and medical services provided for fifteen (15) covered illnesses and conditions, including kidney cancer and bladder cancer.

87. VHA uses managerial cost accounting to determine the cost of past care provided at VA operated healthcare facilities. The total cost to VHA to render care to an individual includes direct and indirect costs, which represent the cost of providing health care for any given medical encounter, whether in an inpatient or outpatient setting.

88. Since 2019, Mr. Mousser has been eligible for and receives health care for his cancer and depression from the VHA. The VHA reported all of Mr. Mousser's healthcare benefits received from the VHA between 2005 and December 31, 2025, and the costs of such benefits. Mr. Mousser has received past VHA healthcare that was clinically related to Mr. Mousser's cancer or depression.

89. Mr. Mousser does not have health insurance other than through the VA. If Mr. Mousser is found to require future health care related to his cancer and depression, it is reasonably certain that such health care will be obtained from the VHA.

90. The VBA is a branch of the Department of Veterans Affairs that provides a variety of benefits and services to service members, Veterans, and their families. VBA oversees the delivery of disability compensation – a tax-free monetary benefit paid to Veterans with disabilities that are the result, or are presumed to be the result, of a disease or injury incurred or aggravated during active military service. Payments of disability compensation benefits are based on the type and severity of the Veteran's disability.

91. The amount of disability compensation benefits is determined by the Veteran's level of disability, or disability rating. It is uncommon for a Veteran's disability rating to change in the future. A rating would only change in the future after a medical reexamination to determine its current severity. In some circumstances, the VBA's policy is that medical reexaminations should not be conducted. Specifically, when a disability is static, when a Veteran is over age 55 (absent unusual circumstances), or when there has been no material improvement in a disability for a period of five or more years, *inter alia*, the VBA's policy is that no reexamination should be conducted. If a Veteran is over the age of 55, the VBA does not request a routine future examination unless the Veteran has a condition that is

temporary in nature. It is highly unlikely that a disability rating decision would change for a Veteran over the age of 55 if there was no need for further evaluation, such as for static disabilities.

92. VBA's disability compensation is funded through annual Congressional appropriations, which are from the general fund. Congress has always funded veteran benefits historically. In fact, there has been an increase in the average amount of disability benefits received by Veterans because the average disability rating for Veterans has increased. The number of Veterans receiving disability benefits has also increased. The PACT Act of 2022 was a primary contributor to those increases. After the passage of the PACT Act, the VA's total budget increased from $166.9 billion dollars in 2016 to $441.2 billion dollars in 2026.

93. Over time, Congress and VBA have expanded benefits to include additional categories of benefits. Mr. Mousser is eligible for and receives disability compensation from the VBA for his service-connected conditions, including for his cancer, and his insomnia with depressive disorder.

94. The VBA provided the monthly disability benefits that Mr. Mousser has received for his service-connected conditions. This includes benefits for the following service-connected disability ratings: tinnitus (10%); neoplasm of kidney (urothelial cancer), status post right kidney removal and ureter removal with left kidney chronic kidney disease (30%); recurrent cystitis of the bladder with hematuria (now also claimed as overactive bladder with nocturia) (40%); surgical scars, anterior trunk (0%); and insomnia with depressive disorder, chronic, ongoing (70%). Except for the rating for tinnitus, these ratings are related to Mr. Mousser's cancer or depression. These ratings are unlikely to change given that Mr. Mousser is over the age of 55 and they are static.

95. Mr. Mousser's current total combined service-connected disability rating is 90%. Mr. Mousser is compensated at the 100% rate because he qualifies for individual unemployability. Additionally, Mr. Mousser qualifies for a Special Monthly Compensation.

96. It is reasonably certain that Mr. Mousser will continue to receive disability compensation from the VBA in connection with his cancer or depression at an amount reasonably similar or the same amount that he currently receives, adjusted upward for cost of living.

## CONCLUSIONS OF LAW

### I. Under the CLJA, Plaintiff Must Prove Exposure and Causation.

1. The CLJA "allows an 'individual' to bring an action for 'appropriate relief for harm that was caused by exposure to the water at Camp Lejeune.'" *In re Camp Lejeune Water Litigation*, 736 F. Supp. 3d 311, 317 (E.D.N.C. 2024) (quoting CLJA § 804(b)). Individuals "can prove that their individual exposure caused their harm [(1)] by proof 'sufficient to conclude that a causal relationship exists' between exposure and harm or [(2)] by a reduced burden of proof ('sufficient to conclude that a causal relationship [between exposure and harm] is at least as likely as not')." *Id.* at 319 (quoting CLJA § 804(c)(2)(A)-(B)).

2. While the CLJA's relaxed burden of proof is a departure from the "common-law preponderance burden of proof standard," such departure "does not demonstrate Congress's intent to replace the common-law causation framework." *Id.* at 323; *see id.* at 325.

3. To obtain "relief for harm that was caused by exposure to the water at Camp Lejeune," CLJA § 804(b), a plaintiff must prove: (1) "individual exposure . . . of no less than 30 days" (exposure), *id.* at 321-22; (2) to "an agent . . . [that] *can* cause the disease at issue" (general

causation), *id.* at 322 (emphasis added); and (3) a "causal relationship" between "exposure to the water at Camp Lejeune and the harm . . . at least as likely as not" (specific causation), *id.* at 323-24.

4. Plaintiff must prove both general and specific causation—that is, he must demonstrate through admissible expert testimony that his "exposure to an agent can cause the disease at issue" (general causation), and that his "exposure was a cause in fact of his . . . harm (specific causation)." *Id.* at 319, 322 (emphasis added). Specific causation requires a "but-for analysis," meaning that "'in the absence of the [exposure], the [harm] would not have occurred.'" *Id.* at 319 (quoting Restatement (Third) of Torts: Phys. & Emot. Harm § 26 cmt. (b)).

## II. Plaintiff Cannot Provide Admissible Evidence of His Levels of Exposure Through ATSDR's Camp Lejeune Water Models.

5. "First, Plaintiffs must establish the alleged chemicals in the water at Camp Lejeune from 1953 to 1987." Jun. 28, 2024, Order, D.E. 247 at 2 ("For example, what were the levels of benzene, TCE, PCE, and vinyl chloride present at the Hadnot Point, Holcomb Boulevad, and Tarawa Terrace in 1977?"); *see also In re Camp Lejeune Water Litigation*, 736 F. Supp. 3d at 321 ("Individual exposure is essential to the CLJA's causation requirement.").

6. Plaintiff's experts fail to establish that ATSDR's Camp Lejeune water models are sufficiently reliable, accurate, precise, and certain to establish his levels of contaminant exposure from Camp Lejeune water.

7. ATSDR's Camp Lejeune water models were not developed for the purpose of determining an individual's level of contaminant exposure from contaminated water at Camp Lejeune, but rather to estimate relative contaminant levels over different time periods for the purpose of supporting ATSDR's epidemiological studies. Accordingly, the models used

conservative, health-protective assumptions. As it relates to the Hadnot Point/Holcomb Boulevard water model that Plaintiff relies upon, ATSDR informed the public that its "exposure estimates [from the simulated monthly mean contaminant concentrations at Hadnot Point] cannot be used alone to determine whether you, or your family, suffered any health effects as a result of past exposure to TCE-contaminated drinking water at USMCB Camp Lejeune" and that "the available data are not specific enough to accurately estimate daily levels of VOCs (PCE, TCE,1,2-tDCE, VC, and benzene) in the Hadnot Point-Holcomb Boulevard (HPHB) study area." For that reason, the water models are unhelpful to the trier of fact apart from the question of reliability. *See* Fed. R. Evid 702(a); *Coleman v. Union Carbide Corp.*, No. CIV.A. 2:11-0366, 2013 WL 5461855, at *24 (S.D.W.Va. Sept. 30, 2013) (finding expert's exposure analysis was irrelevant because it "did not intend to prove a specific level of harm."). Moreover, "[f]it is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes. ... Rule 702's helpfulness standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Daubert v. Merrell Dow Pharm*., 509 U.S. 579, 591-92 (1993) (citations and internal quotation marks omitted).

8. Regardless of the intended purpose of ATSDR's Camp Lejeune water models or how ATSDR used them, the monthly mean concentrations of PCE, TCE, 1,2-t DCE, VC, and benzene simulated by ATSDR's Camp Lejeune water models are not sufficiently reliable, accurate, precise, or certain, to estimate Plaintiff's exposure to contaminants in Camp Lejeune water. The fact that key data was unavailable in developing the water models, most importantly contaminant concentration data prior to 1982, alone makes ATSDR's water models unreliable for simulating or modeling monthly contaminant concentration levels

over 30 years into the past in the Hadnot Point Water Treatment Plant at Camp Lejeune. *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 281 (4th Cir. 2021) ("expert testimony must be "based on sufficient facts or data,") (quoting Fed. R. Evid. 702).

**III. Plaintiff Cannot Provide Admissible Expert Evidence of Causation.**

9. Plaintiff must offer admissible expert opinion evidence to establish causation in this case. For expert opinion evidence to be admissible, Federal Rule of Evidence 702 requires that (1) "the proposed expert witness is qualified;" (2) "the proposed testimony is relevant;" and (3) "the proposed testimony is reliable." *See* Expert Admissibility Order, D.E. 886, at 4-5 (citations omitted). Experts must exercise "in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 14 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)). Rule 702's admissibility "standard is 'more likely than not'" and "[t]he court will hold every expert in this litigation to this standard as applied to the expert's field and chosen method." *Id.* at 17 (quoting Fed. R. Evid. 702 advisory committee's note to 2023 amendment).

10. Plaintiff's experts must "prove general causation through epidemiological evidence, dose-response relationship, and background risk of disease." *Id.* at 10 (quoting *In re Deepwater Horizon BELO Cases*, 119 F.4th 937, 941 (11th Cir. 2024)). Experts relying on epidemiological evidence to "distinguish a causal connection from a mere association" apply the "two-step Bradford Hill method," the "weight-of-the-evidence method," or a combination of the two. *Id.* at 10, 12 (quoting *In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*, 858 F.3d 787, 795 (3d Cir. 2017)).

11. Plaintiff's experts fail to reliably apply the Bradford Hill general causation methodology. The Bradford-Hill method proceeds in two steps. The first step requires an expert to

"identify a statistically significant association" between the toxic agent and the disease in question. Expert Admissibility Order at 10, D.E. 886. At step two, the expert "considers nine factors to determine whether that association [identified in step one] supports a causal inference." *Id.* at 11.

12. Plaintiff's experts fail to reliably identify a statistically significant association between chemicals in the Camp Lejeune water and Mr. Mousser's cancer. "[A] statistically significant association" exists "only when the odds ratio is expressed with a 95% confidence interval ***(consistently)*** and when that interval does not include an odds ratio of 1.0 or below.'" Expert Admissibility Order at 11, D.E. 886 (emphasis added) (quoting *Smith v. Wyeth-Ayerst Lab'ys Co*., 278 F. Supp. 2d 684, 691 n.8 (W.D.N.C. 2003)). This standard requires the expert to "rul[e] out alternative explanations" for "'a potential association result[ing] from limitations in the study, like chance or bias.'" *Id.* at 10 (quoting *In re Deepwater Horizon*, 119 F.4th at 941).

13. Plaintiff's experts fail to reliably apply the Bradford-Hill factors to reach an admissible opinion that Mr. Mousser's exposure to chemicals in the water at Camp Lejeune could cause his cancer. After identifying a statistically significant association that meets the threshold requirement of Bradford-Hill, the expert must reliably apply the other Bradford-Hill factors to reach an admissible opinion on causation. Those factors are: "(1) temporal relationship, (2) strength of the association, (3) dose-response relationship, (4) replication of the findings, (5) biological plausibility, (6) consideration of alternative explanations, (7) cessation of exposure, (8) specificity of the association, and (9) consistency with other knowledge." Expert Admissibility Order at 12, D.E. 886 (citing *In re Deepwater Horizon*, 119 F.4th at 941). In particular, Plaintiff's experts fail to identify strong associations,

consistent associations, or dose-response relationships that would support an inference of causation under the Bradford Hill analysis.

14. Plaintiff's experts fail to reliably apply the differential etiology technique to determine that Mr. Mousser's exposure to the chemicals in the Camp Lejeune water did, in fact, cause his cancer. A "differential etiology, is a standard scientific technique of identifying the cause of a medical problem … and generally is accomplished by determining the possible causes for the patient's symptoms and then eliminating each of these potential causes until reaching one that cannot be ruled out or determining which of those that cannot be excluded is the most likely." *Stoddard v. PLIVA USA, Inc.*, 2013 WL 6199268, * 6 (E.D.N.C. Nov. 2013) quoting *Westberry v. Gislaved Gummi AB*, 177 F.3d 257, 262 (4th Cir. 1999). Because Plaintiff's experts could not reliably establish that the chemicals in the Camp Lejeune water could cause Mr. Mousser's cancer, as a matter of general causation, they could not reliably consider it as a possible cause of his cancer. But, even if they could consider it as a possible cause, they failed to reliably rule out other potential causes of his cancer, including Mr. Mousser's smoking habit, chronic inflammation, and idiopathy. *See* Expert Admissibility Order at 6 &7-8, D.E. 886 (citing *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1050-54 (9th Cir. 2025) (affirming exclusion of oncologist's opinion on specific causation because the oncologist failed to follow the differential etiology methodology his report purported to employ and failed to reliably rule out obesity as a potential cause of plaintiff's cancer)).

## IV. Plaintiff Cannot Provide Sufficient Evidence of Causation.

15. Plaintiff has failed to provide proof "sufficient to conclude that a causal relationship exists" between his exposure to chemicals in the Camp Lejeune water and his cancer, or proof "sufficient to conclude that a causal relationship" between his exposure to chemicals in the Camp Lejeune water and his cancer "is at least as likely as not." CLJA § 804(c)(2)(A)-(B). The evidence does not establish that the chemicals in the Camp Lejeune water are capable of causing Mr. Mousser's cancer, let alone that they did, in fact, cause Mr. Mousser's cancer. Even under the "at least as likely as not" standard, the Plaintiff has not met his burden of proof on causation. The evidence establishes that it is most likely that Mr. Mousser's cancer was caused by his smoking habit or was the idiopathic result of the background risk of cancer in the population.

## V. Any Damages That Plaintiff Has Suffered or Will Suffer as a Result of His Cancer Must Be Offset by Awards, Payments, and Benefits That He Has Received and Will Receive from the Department of Veterans Affairs.

16. The CLJA's offset provision, which provides in relevant part:

> (e).EXCLUSIVE REMEDY.—
>
> (1) IN GENERAL.— An individual, or 1egal representative of an individual, who brings an action under this section for a harm described in subsection (b), including a latent disease, may not thereafter bring a tort action against the United States for such harm pursuant to any other law.
>
> (2) HEALTH AND DISABILITY BENEFITS RELATING TO WATER EXPOSURE.—Any award made to an individual, or legal representative of an individual, under this section shall be offset by the amount of any disability award, payment, or benefit provided to the individual, or legal representative—
>
> (A) under—
>
> (i) any program under the laws administered by the Secretary of Veterans Affairs;

> (ii) the Medicare program under title XVIII of the Social Security Act (42 U.S.C.1395 et seq); or
>
> (iii) the Medicaid program under title XIX of the Social Security Act (42 U.S.C. 1396 et seq; and
>
> (B) in connection with health care or a disability relating to exposure to the water at Camp Lejeune.

Offset Order at 1-2, D.E. 885 (quoting CLJA § 804(e)).

17. In addition to past awards, payments, and benefits provided in connection with health care or a disability relating to exposure to the water at Camp Lejeune, the United States is entitled to sufficiently certain and calculable future awards, payments, and benefits. "Congress chose to limit recovery through an express offset provision tied to '[a]ny award' and 'any' qualifying disability award, payment, or benefit." *Id.* (quoting CLJA § 804(e)(2)). Thus, the CLJA's offsets provision encompasses future awards, payments, or benefits as offsets. *Id.* at 5, 6, D.E. 885. The United States is entitled to "any proposed future offset [that] is sufficiently certain and calculable." *Id.* (observing that "courts routinely assess future sums when calculating offsets and preventing double recovery" (citations omitted)).

18. There is no categorical limitation on offsets. According to "the 'plain and unambiguous' text" of the CLJA, the Court is required to offset *any* award by the amount of *any* qualifying sum. *Id.* (citing *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002)). "Congress enacted an express and comprehensive offset provision," and "the [C]ourt must follow the CLJA as enacted." *Id.* at 11-12. Because Congress chose "award-level language," *id.*, offsets must be applied to "any award."

19. Plaintiff has received past awards, payments, and benefits provided by the Department of Veterans Affairs in connection with health care or a disability relating to exposure to the water at Camp Lejeune. Plaintiff will also receive sufficiently certain and calculable future

awards, payments, and benefits from the Department of Veterans Affairs in connection with health care or a disability relating to exposure to the water at Camp Lejeune. The United States is entitled to these offsets for any award.

**VI. Conclusion**

20. Plaintiff has failed to establish that he is legally entitled to any relief under the CLJA and therefore the United States is entitled to entry of judgment in its favor.

Dated: October 19, 2026

Respectfully Submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

JONATHAN D. GUYNN
Deputy Assistant Attorney General
Torts Branch

BRIDGET BAILEY LIPSCOMB
Chief
Camp Lejeune Justice Act Section

HAROON ANWAR
SARA J. MIRSKY
Assistant Directors

ADAM BAIN
Chief Litigation Counsel

*/s/ Carson M. Garand*
CARSON M. GARAND
La Bar No. 38229
Trial Attorney
United States Department of Justice
Civil Division, Torts Branch
Camp Lejeune Justice Act Section
1100 L Street, NW
Washington, DC 20005
202-445-0759
Carson.m.garand@usdoj.gov

Attorney inquiries to DOJ regarding CLJA:
(202) 353-4426

**CERTIFICATE OF SERVICE**

I hereby certify that on October 19, 2026, a copy of the foregoing document was served on all counsel of record by operation of the court's electronic filing system and can be accessed through that system.

*/s/ Carson M. Garand*
CARSON M. GARAND