IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:23-CV-00667

| | |
|---|---|
| Frank Mousser,<br><br>Plaintiff,<br><br>v.<br><br>United States of America,<br><br>Defendant. | PLAINTIFF FRANK MOUSSER'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW |

Plaintiff Frank Mousser brought this action under the Camp Lejeune Justice Act (the "CLJA" or the "Act") seeking relief for the kidney cancer he contends was caused by the water at Camp Lejeune. The Court held a bench trial on October 26 and 27, 2026, in Elizabeth City, North Carolina. Under Federal Rule of Civil Procedure 52(a)(1), the Court makes the following findings of fact ("FOF") and conclusions of law ("COL").

## FINDINGS OF FACT

### I. The Stipulated and Admitted Facts

1. The following facts are not in dispute because they are stipulated in the Amended Pretrial Order ("PTO"), No. 7:23-cv-00667, D.E. 99; admitted in the United States' Answer to the Master Complaint ("Answer"), D.E. 50, or in the United States' responses to Plaintiff's Requests for Admission and Interrogatories; asserted by the United States in its contentions and not disputed; or shown in exhibits admitted at trial.[1]

[1] Unless otherwise noted, citations to "D.E." are to the master docket, *In re Camp Lejeune Water Litig.*, No. 7:23-cv-897 (E.D.N.C.).

### A. Camp Lejeune and Its Water

2. The United States owned, operated, and managed Camp Lejeune throughout the period of August 1, 1953, through December 31, 1987. PTO at 3, § I.E.4; Answer ¶ 20.

3. Chemicals from sources on or around the base seeped into the groundwater, and the people who lived and worked there "drank, cooked with, bathed in, and otherwise came into contact with water sourced from the groundwater below Camp Lejeune." Answer ¶ 110.

4. The Hadnot Point Water Treatment Plant served the Hadnot Point barracks from 1943 and the French Creek barracks from 1947, both until 2000. Answer ¶ 42.

5. The Hadnot Point Industrial Area and the Hadnot Point Landfill were the sources of the contamination in the wells feeding the plant. PTO at 3, § I.E.7.

6. Water from a contaminated well was mixed with water from the system's other wells, and contaminants that entered the Hadnot Point reservoirs "would flow through the system to the point of delivery." Answer ¶¶ 25, 28.

7. Laboratory reports on the base water from about October 1980 and March 1981 noted that it was "highly contaminated" with solvents, and in 1983 Grainger Laboratories reported that Hadnot Point samples "exhibit contamination from both Trichloroethylene [TCE] and Tetrachloroethylene [PCE]." Answer ¶¶ 130, 132, 152.

8. On August 10, 1982, Grainger Laboratories wrote to the Commanding General of Marine Corps Base Camp Lejeune that the well fields at Hadnot Point and Tarawa Terrace showed contamination that interfered with trihalomethane testing. The contaminants, Grainger wrote, "appeared to be at high levels and hence more important from a health standpoint than the total Trihalomethane content." Grainger also reported that a Hadnot Point sample taken on or about May 27, 1982, held 1,400 µg/L of TCE. Answer ¶¶ 51, 137.

9. Eight days later, on August 18, 1982, the Base's supervisory chemist recorded that the testing of the Hadnot Point system and five others was reduced to quarterly sampling. In December 1983 the Base asked the State for permission to further reduce monitoring at Hadnot Point to once a year. Answer ¶¶ 140, 153.

10. Well HP-602, about 1,200 feet from the Hadnot Point Fuel Farm, held 380 µg/L of benzene in July 1984, and samples taken when it was shut down on November 30, 1984, showed 1,600 µg/L of TCE and 121 µg/L of benzene. Answer ¶¶ 40, 52, 161. Well HP-651, in service from 1972, held 3,200 µg/L of TCE in January 1985 and 18,900 µg/L when it was shut down in February 1985. Answer ¶¶ 41, 172, 177.

11. In October 1989, the Environmental Protection Agency ("EPA") placed Camp Lejeune on its National Priorities List, the "Superfund" list, which required the Agency for Toxic Substances and Disease Registry ("ATSDR") to perform a health assessment of the base. PTO at 4, §§ I.E.12–13.

12. The Department of the Navy has reported "actual and planned spending of approximately $321,000,000 on Installation Restoration Program (IRP) activities at Camp Lejeune through Fiscal Year 2023." This spending includes "groundwater remediation." Def.'s Resp. to Pls.' Interrog. No. 2, at 3 (Mar. 6, 2024).

13. ATSDR is a federal, non-regulatory public-health agency that Congress created in 1980 to carry out the health-related provisions of the laws protecting the public from hazardous waste. PTO at 4, §§ I.E.10–11. Between 2010 and 2013, ATSDR published reconstructed estimates of the contamination of the Hadnot Point water. PTO at 4, § I.E.17. It reported an estimate that 400,000 to 1,100,000 gallons of fuel were in the subsurface at the Hadnot Point Fuel Farm. Answer ¶ 44.

14. ATSDR's contamination model estimates the monthly average concentrations of the chemicals in the finished water (i.e., drinking water) at the Hadnot Point water treatment plant. The ATSDR estimates are reflected in the following graph, and Mr. Mousser's time at Camp Lejeune spanned the period of peak contamination according to ATSDR's model, as reflected in *ATSDR, Chapter A: Summary and Findings*, at A63, fig. A27 (PX 10) (annotated by Plaintiff):



15. The United States agrees that the scientific evidence supports a causal connection between TCE and kidney cancer. PTO at 10, § II.B.3(a); *see infra* ¶ 22.

### B. Mr. Mousser

16. Mr. Mousser's time at Camp Lejeune spanned October 18, 1982, through September 7, 1986, interrupted by periods of deployment. PTO at 2, §§ I.D.3–4; *see also* PTO at 5, § II.A.1(b). Both parties' witnesses measured how long Mr. Mousser was on the base. Mr. Mousser's witness, Dr. Kelly Reynolds, used the dates of his arrival, deployments, and leave, and found that he was on the base for 891 days. Reynolds Rep. App. 8 (PX 91 at 45). Of those, 574 fell between his arrival and the Navy's shutdown of well HP-651, the primary source of the TCE contamination. *See supra* ¶ 10. The United States' witness counted less precisely and treated Mr. Mousser as on base for longer. Under either count, Mr. Mousser was substantially exposed to water containing, among other things, TCE, which the United States agrees can cause kidney cancer.

17. On August 25, 2020, at age 57, Mr. Mousser was found to have a 3.7 cm mass within his right kidney, which was diagnosed as a high-grade papillary upper tract urothelial carcinoma ("UTUC"). PTO at 2, §§ I.D.6, 8–9.

18. On October 20, 2020, surgeons removed Mr. Mousser's right kidney, its ureter, and a small cuff of his bladder, then filled his bladder with a chemotherapy drug to reduce the risk of recurrence. *See* PTO at 2, § I.D.7.

19. Doctors diagnosed him with chronic kidney disease ("CKD") after the surgery, and he has carried a diagnosis of Stage 3a A1 since January 2022. PTO at 2, §§ I.D.10–11.

20. The cancer returned. A growth in Mr. Mousser's bladder found on October 28, 2024, and removed on January 31, 2025, was low-grade papillary urothelial carcinoma. The United

States agrees that this second tumor was a recurrence of the original cancer. PTO at 2, 13, §§ I.D.12–15, II.B.4(kk).

## II. The Disputed Facts

21. With many of the important facts not in dispute, the Court identifies the primary contested issues of fact. Those are (a) whether exposure to the water at Camp Lejeune, at the levels present there, can cause kidney cancer, including UTUC; (b) whether Mr. Mousser's specific exposure caused his cancer; and (c) the extent of Mr. Mousser's injuries and damages. The United States also contends it is entitled to an offset of any award to Mr. Mousser by certain amounts.

### A. Exposure to the Water at Camp Lejeune Can Cause Kidney Cancer, Including UTUC

22. The United States agrees that TCE can cause kidney cancer, contending only that it does so at levels higher than those at Camp Lejeune. PTO at 10, § II.B.3(a). It admits that the finished water of the Hadnot Point Water Treatment Plant, which served the French Creek barracks (Mr. Mousser's barracks), contained TCE, Answer ¶¶ 33, 42, and it does not contend that the water Mr. Mousser drank was free of TCE. It contends instead that his alleged exposures were below the levels that cause kidney cancer. PTO at 12, § II.B.4(ff). Hence the only general-causation question as to TCE is whether the evidence shows that TCE at Camp Lejeune levels can, at least as likely as not, cause kidney cancer. CLJA § 804(c)(2)(B).

23. The Court finds that it does. The evidence shows that TCE, and other chemicals in the water, can cause kidney cancer at the levels found in the Camp Lejeune water. In finding that they can, the Court relies on Dr. Benjamin Hatten, a medical toxicologist and epidemiologist. Dr. Hatten has testified about twice as often for defendants as for plaintiffs and has rejected causation where the evidence did not support it. He used the methods of his scientific fields of epidemiology

and toxicology, which he did not change based on the burden of proof: he searched for relevant studies, read each one, and weighed the evidence under the considerations known as the Bradford Hill considerations, which the field of epidemiology generally uses to make causal determinations. Because the water contained numerous chemicals, Dr. Hatten treated the water itself as the exposure. That is also the question the Act asks: whether harm "was caused by exposure to the water at Camp Lejeune." CLJA § 804(b).

24. Dr. Hatten testified that, in his opinion, the amount of TCE, PCE, and benzene in the water at Camp Lejeune can cause kidney cancer, and the Court finds that opinion reliable and accepts it. As Dr. Hatten testified, the most direct evidence of whether the water at Camp Lejeune can cause kidney cancer is the studies of the people who drank it (the "Camp Lejeune studies"). Those studies measured the risk among people on the base during the years of contamination, which include Mr. Mousser's risk. So they reflect the levels present at Camp Lejeune. Five Camp Lejeune studies examined kidney cancer. Each found a higher overall risk among those at Camp Lejeune than among those at Camp Pendleton, and none found a lower risk. Several results were statistically significant. For example, across the full cohort of Marines and Navy personnel in ATSDR's 2024 mortality study, those who served at Camp Lejeune had a 21 percent higher hazard of death from kidney cancer than those who served at Camp Pendleton (adjusted hazard ratio 1.21, 95% confidence interval 1.02–1.43). In ATSDR's 2018 morbidity study, Camp Lejeune Marines with medium cumulative TCE exposure had 45 percent higher odds of kidney cancer than the least-exposed Marines on the base (odds ratio 1.45, 95% confidence interval 1.05–2.00). Those with high exposure had higher odds still (odds ratio 1.55, 95% confidence interval 0.95–2.54), and ATSDR found that the risk rose with each step up in cumulative exposure. Dr. Hatten discussed numerous other findings from the Camp Lejeune studies that support his opinion that the chemicals

in the water at Camp Lejeune, at the amounts in the water, can cause kidney cancer, and the Court credits that testimony.

25. As Dr. Hatten testified, two features of the Camp Lejeune studies probably made the extra risk of kidney cancer look smaller or less certain than it really is. First, the studies counted everyone stationed at Camp Lejeune as exposed, however short their stay and wherever they lived, including Marines who lived off base or in parts of the base with less contaminated water. Mixing unexposed and less-exposed people into the exposed group waters down the difference between Camp Lejeune and Camp Pendleton; the authors estimated that correcting for it could raise the 2014 study's 35 percent higher risk of dying from kidney cancer to between 43 and 59 percent. Second, most of the people studied were not yet old enough to get kidney cancer at the usual age, so many cancers had not yet appeared when the studies ended. With fewer cases, a real increase in risk is less likely to show up as statistically significant.

26. Dr. Hatten also identified other studies outside of the Camp Lejeune context that corroborate the findings of the Camp Lejeune studies that exposure to the amounts of contaminants in the water can cause kidney cancer, and the Court credits that testimony as well.

27. The United States contends, through its epidemiologist, Dr. Julie Goodman, that—although TCE can cause kidney cancer—there is insufficient evidence to conclude that the amount of TCE in the water at Camp Lejeune can cause kidney cancer. The United States, again relying on Dr. Goodman, claims that the Camp Lejeune studies are not reliable and asks the Court to ignore them because none measured what each person drank and their estimates are not sufficiently pronounced. *See* PTO at 11, § II.B.3(b). This argument fails. Dr. Goodman's credibility was substantially undermined at trial. She has been retained as an expert more than 100 times and has never testified for an injured plaintiff. By her own account, nearly all of her published work—

"high 90 percent"—is funded by someone with "an interest" in the outcome. Goodman Dep. 167:6–168:5. At the request of an asbestos defense lawyer whose firm paid Gradient for the work, she co-wrote a manuscript titled "Cigarette Smoking May Increase Mesothelioma Risk"—though she now agrees that cigarettes do not cause mesothelioma. *Id.* at 65:3–22, 69:14–23, 70:12–71:11, 84:9–11. The manuscript was rejected in peer review. One reviewer called it "a highly biased review of the evidence" and wrote, "I strongly suspect the authors must work with someone with a strong financial interest in this subject." *Id.* at 79:23–80:11. She never tried to correct the record.

28. Dr. Goodman's substantive analysis in this case fares no better. Despite asking this Court to ignore the Camp Lejeune studies for failing to measure lifetime intake of the study participants, neither Dr. Goodman nor the United States identified an environmental or occupational study that measures lifetime intake. Her assessments of the individual studies are also unsettled by her own account. After the plaintiffs moved to exclude her opinions, she submitted corrected summary tables making about 300 changes affecting 75 studies, about 120 of which changed a study feature from a strength to a weakness or the reverse. D.E. 825 at 8, 10. The magistrate judge struck those tables as untimely and as substantive changes beyond proper supplementation. *Id.* at 11, 19. Thus, Dr. Goodman's reports in the trial record retain hundreds of *admitted* substantive errors. The United States paid Dr. Goodman's firm approximately $7 million for these error-ridden reports. This undermines Dr. Goodman's credibility and the reliability of her analysis, as well as the analyses of the United States' other experts that relied on Dr. Goodman's general-causation opinions without independent review. Unlike Dr. Goodman's now-repudiated mesothelioma article, four of the Camp Lejeune studies have also passed peer review, and the fifth was published online following ATSDR's review protocol.

29. Accepting the opinion of Dr. Hatten and rejecting the opinion of Dr. Goodman, the Court finds that the Camp Lejeune studies are reliable and that they, along with a number of studies outside of the Camp Lejeune context, establish that TCE and the Camp Lejeune water generally can cause kidney cancer at the levels present in the Camp Lejeune water.

30. PCE and benzene each can cause kidney cancer as well, as Dr. Hatten opined after reviewing the relevant studies and applying the Bradford Hill methodology. The United States contends, through Dr. Goodman, that the PCE and benzene studies are mostly null, that no animal study shows kidney tumors, and that no mechanism has sufficient support. These arguments fail. First, PCE. Dr. Goodman's own report states that Marines with medium and high cumulative PCE exposure had significantly higher odds of kidney cancer (OR 1.43, 1.02–2.00; OR 2.01, 1.29–3.13). Goodman Rep. at 67–68. The National Toxicology Program ("NTP") and EPA attributed the kidney tumors in PCE-exposed male rats to PCE, and the International Agency for Research on Cancer identified genotoxic PCE metabolites as the most likely mechanism. *Id.* at 68, 72–73. That is the same biological pathway through which TCE acts. Hatten Rep. (PX 34) at 43. Second, benzene. Dr. Goodman acknowledges that NTP and EPA classify benzene as a known human carcinogen, and a study she discusses found higher kidney-cancer risk after benzene exposure. And a meta-analysis of thirty-one risk studies, which Dr. Hatten reviewed, found that occupational benzene exposure was associated with kidney and unspecified urinary-tract cancers (RR 1.20, 1.03–1.39). Hatten Rep. at 31. Thus, the Court finds that the evidence is sufficient to show that it is at least as likely as not that PCE and benzene can also cause kidney cancer.

31. The United States contends that the evidence described above does not apply to Mr. Mousser's specific sub-type of kidney cancer, UTUC. PTO at 11, § II.B.3(c). This argument fails. The renal pelvis is part of the kidney; the United States' own oncologist, Dr. Walter Stadler, names

UTUC with renal cell carcinoma as the most common kidney cancers, Stadler Rep. (Gov't Ex. 934) at 6; and the Camp Lejeune studies report kidney and renal-pelvis cancer as one outcome. Dr. Hatten also explained that urothelial cancers of the renal pelvis "occur in the kidney," that the renal pelvis and ureter share the kidney's blood supply from the renal artery, and that urine flows from the kidney through them. Hatten Rep. at 10, 43. Therefore, it is at least as likely as not that these cancers share the biological mechanism through which TCE and PCE cause kidney cancer.

32. For all the reasons above, the Court finds that it is at least as likely as not that exposure to the water at Camp Lejeune, and to the TCE in it, at the levels present there, can cause kidney cancer, including UTUC, and that the evidence is sufficient to conclude that a causal relationship exists.

**B. Mr. Mousser's Exposure Caused His Cancer**

33. Mr. Mousser was exposed to the contaminated Camp Lejeune water for at least 891 days. For 574 of them, from October 1982 until his deployment in January 1985, the water was contaminated with TCE at its peak levels. Mr. Mousser drank the water from the barracks taps and coolers, in the mess-hall coffee, and from water trailers in the field. He used it to prepare his MREs (Meals, Ready-to-Eat). He showered in it every day. He washed dishes in it on mess duty. His laundry was washed in it. These exposure pathways are cumulative.

34. As explained by Morris Maslia, a witness who led the ATSDR effort to determine the extent of the water contamination over time, Mr. Mousser was on base while the water was most highly contaminated, and he remained on base, drinking water that was still contaminated with benzene, until September 1986. Mr. Mousser's barracks was fed by the contaminated Hadnot Point water system. Mr. Mousser also visited and drank water from the contaminated Tarawa Terrace water system.

35. Mr. Mousser's exposure scientist witness, Dr. Reynolds, calculated that, over his 891 days on base, Mr. Mousser ingested about 788,000 micrograms of TCE, 37,600 of PCE, 66,000 of vinyl chloride, and 16,500 of benzene. Reynolds Rep. App. 8, Summed Variable Totals, Chart 3 (PX 91 at 44). This estimate is conservative; it counts only what he drank, not what he inhaled or absorbed through his skin. Notably, the United States' exposure scientist, Dr. Judy LaKind, used the same water concentrations, and her high-end estimates assume he drank more each day than Dr. Reynolds assumed. Applied to the same water, the United States' witness' high-end intakes yield more of each chemical than Dr. Reynolds' estimate.

36. The Court finds that Mr. Mousser's extensive exposure to the contaminated water on base at least as likely as not caused his kidney cancer. In finding specific causation between the water and Mr. Mousser's kidney cancer, the Court relies primarily on Dr. Joseph Del Pizzo, a urologic surgeon who has treated kidney cancers, including UTUC, for twenty-five years, and finds his testimony persuasive. He applied a differential diagnosis method, the method Dr. Stadler agreed is appropriate, and neither Dr. Del Pizzo's method nor the certainty of his conclusion depended on the Act's burden of proof. Dr. Del Pizzo first determined that the water was a potential cause of Mr. Mousser's cancer: Mr. Mousser's exposure to each contaminant falls in the highest category of ATSDR's 2014 Marine study, which reports elevated kidney-cancer risk in each, and the more than thirty years between exposure and diagnosis fit the lags in those studies. He then weighed each recognized risk factor for UTUC and each alternative the United States identified, and explained why none of them, rather than the water, likely accounts for this cancer. Apart from smoking, none of the recognized risk factors appears in Mr. Mousser's history, and his hypertension and slightly elevated weight are not established risk factors for UTUC. As for smoking, Dr. Del Pizzo explained that Mr. Mousser's limited smoking was not comparable as a

risk to his exposure to a chemical known to cause kidney cancer at the height of the base's contamination. He explained why the water exposure weighed much more heavily than smoking as the likely cause of Mr. Mousser's kidney cancer. The Court credits that testimony.

37. The United States relies on Dr. Stadler, who concluded that the cancer was "less likely than not due to any exposure to Camp Lejeune drinking water." Stadler Rep. at 12. But Dr. Stadler *never weighed the water* against the alternatives. *See id*. at 12–13 (omitting the water from list of potential causes). He left it off his differential because he accepted the opinion of Dr. Goodman that exposure at Camp Lejeune levels is not associated with kidney cancer. The Court has rejected that view and explained that Dr. Goodman's opinion in this case is due very little weight. *See supra* ¶¶ 23–32. Dr. Stadler did not know the levels in the water Mr. Mousser drank. He also relied in part on Dr. Lisa Bailey's risk calculations, which the Court struck. D.E. 821 at 7–8, *aff'd*, D.E. 884. Thus, the Court affords Dr. Stadler's opinion no weight on whether the water was or was not a cause of Mr. Mousser's kidney cancer.

38. Nor do the alternatives Dr. Stadler offers provide compelling alternative accounts for the cancer. PTO at 13, § II.B.4(ii)–(jj). First, smoking. The Court recognizes that smoking is an established risk factor for UTUC and that a former employer recalled Mr. Mousser smoking in 2012. But the risk depends on dose. Mr. Mousser smoked about a pack every seven to ten days from late 1983 to 1988. Dr. Stadler agreed that a pack every ten days would be less significant. He did not know how much Mr. Mousser smoked during the year in 2012 that a former employer recalled. Second, inflammation. Dr. Stadler posits "possibly an undiagnosed chronic inflammatory condition of the right kidney." Stadler Rep. at 13. The existence of such a condition was not supported, and Dr. Stadler could not say to a reasonable degree of medical certainty that any such condition was even as likely as not related to the cancer. Third, chance, or "idiopathy." Dr. Stadler

agreed that idiopathy is not a cause itself but describes the circumstance when the cause of a disease is unknown, and idiopathy is no longer considered once a cause is found. Here, Dr. Del Pizzo offered credible testimony that the cause was at least as likely as not exposure to the Camp Lejeune water, and Dr. Stadler did not consider that potential cause, so it was inappropriate for him to consider idiopathy.

39. The United States attacks ATSDR's water model as "inaccurate, biased-high." PTO at 9, § II.B.1(g). Through Dr. Remy J.-C. Hennet, it contends that much of the contamination escaped into the air before anyone drank the water. *Id.* § II.B.1(d), (i). This argument fails. First, the ATSDR model is reliable. In so finding, the Court relies on Mr. Maslia, who led ATSDR's water modeling. ATSDR built its models to reconstruct monthly finished-water concentrations. It calibrated them to measured data under the procedures of the American Society for Testing and Materials, the American Water Works Association, and the United States Geological Survey, and submitted them to blinded peer review. None of this was done for litigation. Maslia Rep. (PX 11) at 10, 17. The United States offers no competing model. Its exposure scientist, Dr. LaKind, used ATSDR's concentrations as "the most comprehensive dataset available" and knows of no other data that could have been used. LaKind Dep. 24:14–20, 25:3–7, 25:17–26:3, 49:22–25. Second, Dr. Hennet's volatilization opinions are unproven. He opines that about 17 percent of the TCE escaped at the treatment plant. Hennet Rep. at 5-7 (Ex. 2-4). But that figure is a calculation, not a measurement. And the Marine Corps' own consultant, using the same approach, calculated 6.1 percent. *Id.* at 5-6 to 5-7, 5-37 n.132. He also opines that filling the water trailers released 41 to 61 percent of the contaminants in the water. *Id.* at 3-3, 5-43. But that figure assumes trailers filled through a filler pipe and strainer, a method he took from a diagram. When he wrote his report, he had never seen a trailer filled, and the trailers he photographed had no filler pipe. He further opines

that the plant's water was "[l]ikely not contaminated with benzene." *Id.* at 5-32 to 5-33. He agrees that well HP-602, which supplied the plant, held benzene averaging 228 µg/L and reaching 720 µg/L. But he calculates that blending and treatment reduced it to trace levels in the finished water. *Id.* That calculation does not withstand scrutiny. It borrows another well's pumping frequency, assumes all of the system's wells pumped equally, and builds in the plant loss the Court has found unproven. *Id.* at 5-29 to 5-30, 5-33. The Court finds the calculation too speculative to credit. For these reasons, the Court rejects Dr. Hennet's volatilization opinions and finds that ATSDR's monthly concentrations reliably estimate the TCE, PCE, vinyl chloride, and benzene in the Hadnot Point water during Mr. Mousser's time on base. Third, even if the Court were to accept Dr. Hennet's opinions, the result would not change. The 2014 study on which Dr. Del Pizzo relied assigned each Marine ATSDR's modeled concentrations, with no adjustment for treatment losses, field water, or time away from base. Whatever losses Dr. Hennet believes occurred would affect all Marines similarly. So Mr. Mousser's exposure would still fall in its highest category for every contaminant.

40. For all the reasons above, the Court finds that Mr. Mousser's exposure to the water at Camp Lejeune caused his UTUC and its recurrence. The Court finds that none of the alternatives the United States advances accounts for it instead, and that the evidence is sufficient to conclude that a causal relationship exists. Without that exposure, Mr. Mousser more likely than not would not have developed UTUC.

**C. Mr. Mousser's Damages**

**i. Mr. Mousser Has Suffered Greatly Since His Cancer Was Found**

41. In describing what Mr. Mousser has endured, the Court relies on the testimony of Mr. and Mrs. Mousser and on his medical and VA records. Mr. Mousser was 57 when he learned

he had cancer. PTO at 2, §§ I.D.6, 8–9. Eight weeks later, surgeons cut him open and removed the entirety of his right kidney, its ureter, and a cuff of his bladder. They then filled his bladder with chemotherapy. PTO at 2, § I.D.7. Painful cystoscopy procedures—in which a doctor inserts a camera through his penis into his bladder—followed, every three months at first, then every six, then once a year, and he will need them for the rest of his life.

42. In October 2024 the cancer returned. It had spread to his bladder, and in January 2025, surgeons removed this second tumor. PTO at 2, §§ I.D.12–15. Weeks later, his VA psychologist recorded that he was "still reeling from the news that they found cancer cells in his bladder" and had "new fears with the new cancer emergence." Fryar Updated Rep. (Oct. 5, 2026), Addendum at 4 (PX 132); VA Behavioral Health Follow-Up Note (Mar. 19, 2025), 00667_MOUSSER_VHA_0000002023–24 (Gov't Ex. 685). The surveillance continues, and the risk of recurrence remains.

43. The harm will continue. With one damaged kidney, he is likely to need dialysis and a kidney transplant within a few years, and the cancer has taken about a decade from his life. As detailed below, the Court finds that Mr. Mousser has endured, and will continue to endure, physical pain, fear, anxiety, depression, and isolation; the loss of his work and of his intimate life with his wife; the loss of much of the enjoyment of life; a likelihood of an extremely difficult end of his life spent on dialysis or needing a kidney transplant; and a likely death more than ten years early, all as a result of his exposure to the water at Camp Lejeune.

### ii. The Cancer Caused Mr. Mousser's Kidney Disease, Will Require Renal Replacement Therapy, and Has Shortened His Life Expectancy by a Decade

44. Relying on Dr. Matthew Cooper, a transplant surgeon who performs about sixty kidney transplants a year, the Court finds that Mr. Mousser's kidney cancer will likely require him to undergo renal replacement therapy, including dialysis and, if he can obtain one, a kidney transplant, and that Mr. Mousser will likely die significantly early. Dr. Cooper testified that after a kidney is removed, the other must work harder, and over time that strain can damage and scar the kidney. A healthy remaining kidney brings creatinine back to normal; Mr. Mousser's has not. Dr. Cooper opined that Mr. Mousser will need renal replacement therapy within two to four years, starting with dialysis while awaiting a transplant, and that even with a transplant he will live only to about age 75. The United States contends that Mr. Mousser's kidney function is stable. The Court recognizes that Mr. Mousser's creatinine has not risen substantially, but it has mostly stayed above the normal range while medication protects his kidney. The United States' witness, Dr. Johnstone, also agreed that the remaining kidney likely has the nephrosclerosis found in the removed one and that, if it progresses, he has no right kidney to fall back on. Dr. Johnstone's Kidney Failure Risk Equation calculation puts the five-year risk of dialysis at less than 1 percent. The Court recognizes that calculation and that Dr. Cooper did not examine Mr. Mousser. Neither did Dr. Johnstone. But the equation is only an estimate, it looks only five years ahead, and it relies on urine values taken while on medication. The Court finds that the cancer and the loss of the kidney caused Mr. Mousser's chronic kidney disease or, at the least, made it worse. Crediting Dr. Cooper, the Court finds that the cancer has reduced Mr. Mousser's statistical life expectancy of 85.8 years to 75, which he will likely reach only with a transplant. The United States contends that

heart disease, not the cancer, will shorten his life. The Court recognizes that his heart disease is serious; he had stents and bypass surgery before the cancer. But kidney disease combined with high blood pressure "significantly increases the risk of cardiovascular disease," Cooper Rep. at 3–4, so the disease the cancer caused adds to that very risk. The Court finds that the cancer has shortened Mr. Mousser's life by about 10.8 years and will likely require the medical treatment in the life care plan Mr. Fryar prepared and Dr. Cooper adopted.

### iii. The Cancer Caused Mr. Mousser's Depression, Ended His Work, and Took His Intimate Life

45. In making its findings on Mr. Mousser's depression, the Court relies on Mr. and Mrs. Mousser and his VA records. He had no depression diagnosis or mental-health treatment before the cancer. VA found his mood disorder secondary to the cancer. Gov't Ex. 909 at VBA 2739, 8148–49; *see also* PX 121 at 00667_MOUSSER_0000006558. The United States attributes the depression to other causes, such as his childhood, his sleep apnea, and aging. The Court recognizes that records before 2020 note fatigue and insomnia. But his childhood, his back pain from a car accident twenty years ago, and the medication he took for it all came long before the cancer without producing any depression; and VA's sleep apnea examinations record an onset after the depression began. Gov't Ex. 910 at VBA 32438, 35283. The United States' psychiatrist, Dr. Bursztajn, does not explain why conditions of such long standing produced no depression until the cancer. Thus, the Court gives his opinion little weight. The Court finds that the cancer, its treatment, and the resulting kidney disease caused Mr. Mousser's depression, anxiety, and withdrawal.

46. The cancer and its effects also ended Mr. Mousser's intimate life with his wife. The change began shortly after his depression diagnosis. Mrs. Mousser attributed it to, among other

things, his nighttime bladder urgency, his depression, and his medications, and she believed the cause was both physical and emotional. The United States contends that there is no evidence that the cancer or its treatment caused erectile dysfunction. PTO at 13, § II.B.4(ll). But the loss of intimacy is not purely physical; it also results from Mr. Mousser's depression and other kidney-cancer-related issues, such that exposure to the water caused this loss of intimacy, at least in part.

47. The consequences of the cancer also ended Mr. Mousser's thirty-year career in October 2023. The Court relies on Mr. and Mrs. Mousser, Dr. Cooper, and VA's finding that he was unemployable from that month onward. PX 120 at VBA 8692. The Court recognizes that VA's code sheet gives an earlier date for the same award. But October 2023 is when he stopped working, and the other evidence confirms it. He went back to work two months after the surgery, left his longtime employer in December 2022 "[l]eaving to take care of my health," PX 110 at CAM 0004, took a job at a friend's dealership, and stopped on October 20, 2023. The United States contends that his musculoskeletal pain, hypertension, tinnitus, overactive bladder, sleep apnea, and pre-diabetes ended his work. PTO at 15–16, §§ II.B.4(kkk), II.B.8(d). The Court recognizes those conditions and his long hours in 2023. But none of them kept him from full-time work before the cancer. The conditions that ended his work—depression, fatigue, the added difficulty of controlling his blood pressure with one kidney, and his schedule of medical care—are the ones the *cancer* caused. The United States' vocational expert, Dr. Shahnasarian, rested his contrary opinion largely on physical capacity, and his summary does not mention VA's unemployability finding. Thus, the Court affords it no weight. For all the reasons above, the Court finds that each harm found stems from the cancer or its treatment.

### iv. Mr. Mousser's Damages Before Offsets

48. Past medical care is $62,854, the full cost to VA of the care it furnished for the cancer, the CKD, and the depression, as the United States' own witnesses calculated it. Yount Am. Rep. at 5–6 (Oct. 15, 2026). The Court recognizes that the United States also offers a direct-cost figure of $43,801, PTO at 6–7, § II.A.1(o), but uses $62,854 for both the damage and the offset. *See infra* ¶ 56.

49. For future care, the Court relies on Michael Fryar, a life care planner, and Chad Staller, an economist. Dr. Cooper found each item in Mr. Fryar's plan "fair, reasonable and medically necessary," Cooper Rep. at 6, and the United States' economist, Tricia Yount, CPA, "take[s] no issue with methodologies used in Staller Report regarding future medical care," Yount Am. Rep. at 3. Assuming a transplant, future care through age 75 costs $802,874. Staller Updated Rep. at 7 & tbl. 4. That figure is conservative; it omits dialysis before the transplant, anti-rejection drugs, counseling, and cancer surveillance. *Id.* tbl. 4.

50. For its part, the United States contends that Mr. Mousser will need only a few thousand dollars to cover his future medical expenses. This opinion, presented by the United States' witnesses Dr. Shahnasarian and Ms. Yount, includes no nephrology care, laboratory work, or medication and rests on Dr. Johnstone's view that a transplant is "improbable," Shahnasarian Supp. LCP at 3, which the Court has rejected. Thus, the Court affords it no weight.

51. Lost earning capacity, net of taxes and including lost retirement benefits, is $305,101, measured to a work-life expectancy of 65.6 years. Staller Updated Rep. at 7 & tbl. 1. That is consistent with Mr. Mousser's pre-cancer plan to retire at age 65. The United States' economist takes "no issue with assumptions and methodologies used in Staller Report to calculate

lost earnings," Yount Am. Rep. at 3, and assigns no loss only because Dr. Shahnasarian concluded the cancer did not end his work, a conclusion the Court has rejected.

52. Mr. Mousser's economic damages therefore total $1,170,829: $62,854 in past medical care, $802,874 in future care, and $305,101 in lost earning capacity.

53. For the suffering found in FOF ¶¶ 41–47, past and future, the Court finds damages for pain, suffering, and loss of enjoyment of life, including the shortening of his life, of $__________, or $__________ a day over the roughly 10,000 days from his diagnosis to when he likely would have died but for his exposure to the Camp Lejeune water. The Court recognizes that, as a result of his exposure to Camp Lejeune water, Mr. Mousser will likely die a decade before he otherwise would have. A damages calculation that ignored those lost years of life would reward the United States for shortening Mr. Mousser's life, and the Court declines to give the United States that benefit.

54. Non-economic damages total $__________, and damages before any offset total $__________.

55. The Court makes three alternative findings. First, even assuming, *arguendo*, that Mr. Mousser does not need a kidney transplant, his life would be shorter still, and his future care would cost $777,255, Staller Updated Rep. at 7 & tbl. 4. The Court would not reduce the non-economic award on that harder path, so damages before any offset would be $__________, or $25,619 less. Second, even assuming, *arguendo*, that the law does not permit a separate award for lost years, the Court would award the same non-economic damages for Mr. Mousser's anguish in knowing that his life will be about a decade shorter. Third, even assuming, *arguendo*, that he had no diagnosable psychiatric disorder, the award would be the same, because the fear, anxiety, and withdrawal the Court has found do not depend on a diagnosis; even Dr. Bursztajn acknowledges

that it is likely that Mr. Mousser does indeed experience feelings of depression. The award excludes conditions that preceded the cancer and were not aggravated by it.

### D. The United States Proved Offsets of $353,077

56. The ratings for the kidney cancer, the surgical scars, and the depression the cancer caused, and the unemployability finding and special monthly compensation at the housebound rate that VA rests on them, relate to the water. For purposes of the offset only, Mr. Mousser does not contest that the cystitis rating relates to the water. The Court finds past compensation relating to the water through October 26, 2026, of $290,223 and past VA medical care relating to the water of $62,854, offsets that Mr. Mousser does not contest and that total $353,077. Yount Am. Rep. at 5 & tbl. 4. The United States contends that VA will pay him the same compensation, adjusted for cost of living, for the rest of his life. PTO at 15–16, §§ II.B.4(lll), II.B.5(e)–(f). Its economist values that compensation at $544,008. Yount Am. Rep. at 5 & tbl. 4. It did not prove it. Ms. Yount, the only witness who projected those payments, assumed his ratings would not change and could not say whether they will. And they have not held still: between 2021 and 2024, VA cut his kidney rating twice and restored it once, and ended and restored his special monthly compensation three times. PX 116 at VBA 27738–40; Gov't Ex. 909 at VBA 8148–51; PX 119 at VBA 8220–23; PX 120 at VBA 8692, 8695; Gov't Ex. 910 at VBA 35319–21; PX 117 at VBA 27726–27. The Court recognizes that in April 2024 VA found his disability permanent and total and "not likely to improve." PX 120 at VBA 8692, 8695. That finding is evidence that his conditions will not get better. It is not evidence of what VA will pay. The same decision gives two different dates for his unemployability, PX 120 at VBA 8694; Gov't Ex. 909 at VBA 9474, and VA reached it only after three decisions finding clear and unmistakable error in its own earlier ratings. Gov't Ex. 910 at VBA 37076 (Feb. 8, 2022); PX 117 at VBA 27726–27 (Oct. 18, 2022); Gov't Ex. 909 at VBA

8148; PX 119 at VBA 8220 (Dec. 1, 2023). Whether VA will keep paying at today's rate for the rest of his life is the question, and the United States did not prove the answer. Nor did the United States prove that VA will furnish his future care, as opposed to another provider. PTO at 15, §§ II.B.4(mmm)–(nnn), II.B.5(c). It values that care at $228,147, the cost to VA of the care in Mr. Fryar's transplant plan. Yount Am. Rep. at 4 & tbl. 3. Its own witness, Heather Ford, agreed that eligibility does not guarantee VA care because "it's a veteran's choice as to whether to receive care from VA." Ford Dep. 212:4–15 (PX 137). Mr. Mousser testified that he will use private care if he can afford it. The Court recognizes that VA has been his only health coverage since 2019. But he used VA because it was the only coverage he had, and the Court credits his testimony that he will use private care when he can. He has the right to choose his own providers, the award gives him the means to do so, and he will not use VA for this care. The Court finds offsets of $353,077, and the award net of offsets is $__________.

## PROPOSED CONCLUSIONS OF LAW

### I. The Camp Lejeune Justice Act

1. The Camp Lejeune Justice Act of 2022 ("CLJA"), Pub. L. No. 117-168, § 804, 136 Stat. 1759, 1802–04 (codified at 28 U.S.C. § 2671 note prec.), was enacted as part of the Honoring our PACT Act of 2022 and took effect on August 10, 2022. D.E. 227 at 1; D.E. 284 at 1. Subsection 804(b) provides that "[a]n individual, including a veteran (as defined in section 101 of title 38, United States Code), or the legal representative of such an individual, who resided, worked, or was otherwise exposed (including in utero exposure) for not less than 30 days during the period beginning on August 1, 1953, and ending on December 31, 1987, to water at Camp Lejeune, North Carolina, that was supplied by, or on behalf of, the United States may bring an action in the United

States District Court for the Eastern District of North Carolina to obtain appropriate relief for harm that was caused by exposure to the water at Camp Lejeune." CLJA § 804(b).

2. Subsection 804(c), titled "Burdens and Standard of Proof," provides: "(1) In general.—The burden of proof shall be on the party filing the action to show one or more relationships between the water at Camp Lejeune and the harm. (2) Standards.—To meet the burden of proof described in paragraph (1), a party shall produce evidence showing that the relationship between exposure to the water at Camp Lejeune and the harm is—(A) sufficient to conclude that a causal relationship exists; or (B) sufficient to conclude that a causal relationship is at least as likely as not." CLJA § 804(c). "Congress expressly departed from the common-law preponderance burden of proof standard," and "[s]ubsections 804(c)(2)(A)–(B) supplant the common-law preponderance standard." D.E. 227 at 11 (cleaned up).

3. Congress enacted the CLJA to supply a federal cause of action that North Carolina's ten-year statute of repose had foreclosed in earlier Federal Tort Claims Act litigation. *See id.* at 3–4. "Any applicable statute of repose or statute of limitations, other than under paragraph (2), shall not apply to a claim under this section." CLJA § 804(j)(3).

## II. Jurisdiction, Venue, Exhaustion, and Timeliness

4. This Court "shall have exclusive jurisdiction over any action filed under subsection (b), and shall be the exclusive venue for such an action." CLJA § 804(d). The parties so stipulate. PTO at 1, § I.A.

5. A CLJA plaintiff must first comply with 28 U.S.C. § 2675. CLJA § 804(h). Exhaustion requires that the plaintiff present the claim to the appropriate federal agency, state a sum certain, and wait for a final denial or for six months to pass without final disposition. D.E. 284 at 4–5 (citing 28 U.S.C. § 2675(a), (b), and *Est. of Van Emburgh ex rel. Van Emburgh v.*

*United States*, 95 F.4th 795, 801 (4th Cir. 2024)). The parties stipulate that Mr. Mousser complied with § 2675. PTO at 2–3, §§ I.D.2, I.E.2.

6. A CLJA claim "may not be commenced after the later of (A) the date that is two years after the date of enactment of this Act; or (B) the date that is 180 days after the date on which the claim is denied under section 2675 of title 28." CLJA § 804(j)(2). Mr. Mousser filed this action on March 31, 2023, within two years of enactment. *Mousser v. United States*, No. 7:23-cv-00667 (E.D.N.C.), D.E. 1. His claim accrued before August 10, 2022: his cancer was found on August 25, 2020, and his nephroureterectomy followed on October 20, 2020. CLJA § 804(j)(1); FOF ¶¶ 17–18. The United States' fifth affirmative defense regarding accrual therefore does not apply. *See* PTO at 18, § III.B.5.

7. "The United States may not assert any claim to immunity in an action under this section that would otherwise be available under section 2680(a) of title 28." CLJA § 804(f).

8. This Court has held that the CLJA does not grant plaintiffs a right to trial by jury, reasoning that Congress did not "unequivocally, affirmatively, and unambiguously" authorize a jury trial against the United States under the CLJA. D.E. 133 at 1, 34 (granting motion to strike jury demand); *see* D.E. 204 (denying certification for interlocutory appeal). The Court thus sits as the finder of fact and enters these findings and conclusions under Federal Rule of Civil Procedure 52(a)(1).

## III. The Elements of a CLJA Claim

9. To recover under the CLJA, a plaintiff must establish (1) that he is an individual who "resided, worked, or was otherwise exposed . . . for not less than 30 days" between August 1, 1953, and December 31, 1987, "to water at Camp Lejeune, North Carolina, that was supplied by, or on behalf of, the United States"; (2) that he suffered harm; and (3) a causal relationship between

exposure to the water and the harm meeting the standard of § 804(c)(2). CLJA § 804(b)–(c). "First, a plaintiff must prove the statutorily defined exposure. Second, a plaintiff must 'show one or more relationships between the water at Camp Lejeune and the harm'; that is, plaintiff must produce evidence 'sufficient to conclude that a causal relationship [between exposure and harm] exists' or 'is at least as likely as not.'" D.E. 227 at 8 (quoting CLJA § 804(c)) (alteration in original) (citation omitted).[2]

10. The CLJA does not condition relief on proof that the United States was negligent, breached a duty, or acted wrongfully. The only burden § 804(c) places on the plaintiff is to show exposure, harm, and a causal relationship between the water and the harm. CLJA § 804(c)(1).

11. The 30-day requirement in § 804(b) is a threshold prerequisite that "does not presume harm." D.E. 227 at 7–8. The United States has stipulated that Mr. Mousser satisfies it. PTO at 1, § I.D.1; FOF ¶¶ 16, 33.

## IV. CLJA Standard of Proof

12. In the CLJA, Congress "'expressly departed' from the common-law preponderance burden of proof standard." D.E. 886 at 2 (quoting D.E. 227 at 11); *see id.* at 15–16 (Congress "relaxed" the standard). The Court has described the resulting standard as "a claim where the

[2] For the law governing CLJA claims, the Court looks to the CLJA itself wherever it contains specific direction. Where it is silent, federal law governs because the CLJA created a federal cause of action. *See, e.g.*, *Ellis v. Liberty Life Assur. Co. of Bos.*, 958 F.3d 1271, 1280 (10th Cir. 2020); *see also Maternally Yours v. Your Maternity Shop*, 234 F.2d 538, 540 n.1 (2d Cir. 1956) (explaining that "the source of the right sued upon . . . determines the governing law"). Both the Supreme Court and the Fourth Circuit, however, have indicated that courts operating under federal law should incorporate state law—rather than create new federal rules—when possible. *See Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 98 (1991); *Mayor & City Council of Balt. v. BP P.L.C.*, 31 F.4th 178, 200–01 (4th Cir. 2022). Here, the Court relies on relevant federal law, Fourth Circuit law, and North Carolina law (the site of the harm and the state with the most interest in the determination of the issue, rendering its application reasonable and predictable to the parties), as appropriate.

burden of proof is equipoise." D.E. 886 at 17; *see id.* at 19 ("the equipoise burden of proof"). Under § 804(c)(2)(B), therefore, the plaintiff carries his burden by producing evidence "sufficient to conclude that a causal relationship is at least as likely as not"; a plaintiff whose evidence places causation at equipoise prevails, and he need not show that causation is more likely than not. A plaintiff satisfies the CLJA's "at least as likely as not" standard when the plaintiff establishes a probability equal to or greater than 50 percent. Put another way, a tie goes to the plaintiff. The question for the Court is whether, considering all the evidence, a causal relationship between the water and Mr. Mousser's cancer is at least as likely as not.

## V. Admissibility of Expert Testimony

13. The Federal Rules of Evidence, including Rule 702, govern the admission of expert testimony in CLJA cases, and "Congress choosing a relaxed burden of proof for plaintiffs pursuing CLJA claims does not relax admissibility requirements under Rule 702." D.E. 886 at 2–3, 15–16. The Court has ruled on certain of the parties' Rule 702 motions (*see, e.g.*, D.E. 777; D.E. 886), and reserved remaining admissibility determinations to this trial. D.E. 818 at 12, 19–20 (Order of Feb. 27, 2026). The Court hereby determines that the expert testimony on which the findings and conclusions recited here rest satisfies Rule 702. Dr. Hatten and Dr. Del Pizzo each applied the methodology of his field and did not tailor it to the CLJA's standard of proof, FOF ¶¶ 23, 36, and the ATSDR water models and Dr. Reynolds's exposure estimates rest on methods the Court has found reliable, FOF ¶¶ 34–35, 39–40. The United States' challenges to the ATSDR water models and to Dr. Reynolds's exposure estimates go to their weight but do not render them inadmissible, and the Court has weighed these challenges in its findings and conclusions here. FOF ¶¶ 35, 39–40. The same is true for the United States' challenges to the admissibility of Mr. Mousser's general and specific causation experts. FOF ¶¶ 22–32, 36–38.

## VI. Mr. Mousser Proved Causation Under the CLJA

14. On causation, "Congress established a CLJA action as a modified form of toxic tort claim, requiring evidence of both general and specific causation, with a modified burden of proof." D.E. 227 at 13; *see also* D.E. 886 at 2. Exposure, general causation, and specific causation "are not separate 'elements' of a CLJA claim. Causation subsumes all three." D.E. 227 at 4.

15. General causation asks whether "exposure to an agent can cause the disease at issue," D.E. 227 at 10 (quoting *Rhyne v. U.S. Steel Corp.*, 474 F. Supp. 3d 733, 743 (W.D.N.C. 2020)), including "the levels of exposure that are hazardous to human beings generally." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 263 (4th Cir. 1999) (citations omitted); *see also* D.E. 884 at 8. Mr. Mousser has made this showing. TCE, and the Camp Lejeune water as a whole, can cause kidney cancer, including cancer of the renal pelvis, at the levels Mr. Mousser was exposed to. FOF ¶¶ 22–32. At the very least, Mr. Mousser has shown it is at least as likely as not that TCE and the Camp Lejeune water can each cause kidney cancer.

16. Specific causation asks whether this plaintiff's exposure was a cause in fact of his disease. D.E. 227 at 4. Thus, the plaintiff must show "a causal relationship" between the exposure and the harm. CLJA § 804(c)(1)–(2). A causal relationship exists when the exposure "is a factual cause of an outcome"—that is, a but-for cause. D.E. 227 at 4 (quoting Restatement (Third) of Torts: Phys. & Emot. Harm § 26 cmt. b (2010)). The water need not be the sole cause. The question is whether it was *a* cause—sometimes described as a substantial contributing factor—of the plaintiff's harm, not whether it was a more likely cause than another. *See, e.g.*, *Nix v. Chemours Co. FC*, 805 F. Supp. 3d 626, 647 (E.D.N.C. 2025); *Rhyne*, 474 F. Supp. 3d at 754–55; *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prods. Liab. Litig.*, 150 F. Supp. 3d 644, 649 (D.S.C. 2015); *Connor v. Covil Corp.*, 996 F.3d 143, 148 (4th Cir. 2021); *Finch v. Covil Corp.*, 972 F.3d

507, 512 (4th Cir. 2020); *Ross v. Wash. Mut. Bank*, 566 F. Supp. 2d 468, 479 (E.D.N.C. 2008), *aff'd sub nom. Ross v. FDIC*, 625 F.3d 808 (4th Cir. 2010); *Foushee v. R.T. Vanderbilt Holding Co.*, 507 F. Supp. 3d 654, 661 (E.D.N.C. 2020), *aff'd*, No. 21-1074, 2023 WL 2888561 (4th Cir. Apr. 11, 2023) (per curiam) (unpublished) (all applying "substantial factor" test for specific causation).

17. The plaintiff may meet this burden by showing his "actual level of exposure," *Westberry*, 178 F.3d at 263 (citations omitted), and that it reached the levels found hazardous. *See* D.E. 884 at 4, 7. The plaintiff need not always quantify his dose precisely, and a showing of substantial exposure to a toxic chemical may suffice. *Westberry*, 178 F.3d at 264; *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prods. Liab. Litig.*, 892 F.3d 624, 639–40 (4th Cir. 2018). Indeed, the United States has acknowledged and represented to this Court that a plaintiff exposed to the Hadnot Point water may recover under a "substantial exposure" theory, without precisely quantifying his exposure, so long as that exposure occurred after July 1972, when supply well HP-651 came online and became contaminated. *See* D.E. 368 at 29–30 (citing *Westberry*, 178 F.3d at 264). Mr. Mousser has made more than a sufficient showing: he was substantially exposed to the Hadnot Point water from October 1982 to September 1986. There can be no dispute that he was exposed to a substantial amount of TCE. His cumulative exposure to the Hadnot Point water, FOF ¶¶ 33–35, falls within the exposure categories in which the Camp Lejeune studies found an elevated risk of kidney cancer. FOF ¶¶ 24, 36. As concluded above, Mr. Mousser has established that TCE can cause his kidney cancer at his exposure levels. *See supra* COL ¶ 15 (citing FOF ¶¶ 22–32).

18. Mr. Mousser has also established specific causation through differential etiology. Differential etiology—"a standard scientific technique of identifying the cause of a medical

problem by eliminating the likely causes until the most probable one is isolated"—is a reliable method of proving specific causation once general causation is established. *Westberry*, 178 F.3d at 262–63; *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 200–02 (4th Cir. 2001); *see also* D.E. 444 at 4, 8; D.E. 886 at 10 n.1. The expert need not rule out every conceivable alternative cause; he must take serious account of the alternatives the defendant advances and explain why they were not the sole cause, and the factfinder may assess the weight of that explanation. *Westberry*, 178 F.3d at 265; *Cooper*, 259 F.3d at 202; *In re Lipitor*, 892 F.3d at 644–45. The method looks for the most probable cause, but the law asks only whether the water was *a* cause. *See supra* COL ¶ 16.

19. Plaintiff's expert Dr. Del Pizzo took serious account of the recognized risk factors for Mr. Mousser's kidney cancer and each alternative the United States identified in discovery and at trial, explained why none was the sole cause, and concluded that the Camp Lejeune water was a cause of Mr. Mousser's cancer, and the most likely one. The Court has found his testimony credible. FOF ¶ 36. The alternatives the United States advances through Dr. Stadler—smoking, an underlying inflammatory disease of the kidney that no physician diagnosed, and chance—are not compelling based on the record and on Dr. Stadler's own concessions. FOF ¶ 38. Dr. Stadler's differential etiology is subject to the same standards: a differential that does not "take serious account" of the plaintiff's exposure, and removes it from consideration on the strength of other witnesses' conclusions, is entitled to little or no weight. The Court gives Dr. Stadler's differential etiology no weight on whether the water was a cause because he refused to seriously consider that the water could have been a cause of Mr. Mousser's kidney cancer. *See Westberry*, 178 F.3d at 265; *Cooper*, 259 F.3d at 202–03; FOF ¶ 37.

20. After careful consideration of all of the evidence presented at trial, the Court finds that Mr. Mousser has carried his relaxed burden to prove his CLJA claim. Applying the standards

above, Mr. Mousser has shown that a causal relationship between his exposure to the water at Camp Lejeune and his kidney cancer—an upper tract urothelial carcinoma of the right renal pelvis, FOF ¶ 17—is at least as likely as not, and the evidence is sufficient to conclude that such a causal relationship exists. CLJA § 804(c)(2)(A)–(B); FOF ¶¶ 22–40. Mr. Mousser is entitled to "appropriate relief for harm that was caused by exposure to the water at Camp Lejeune." CLJA § 804(b).

## VII. The Scope of Compensable Harm

21. The harm for which the CLJA affords relief is the harm "caused by exposure to the water." CLJA § 804(b). That harm includes the cancer itself and every injury and condition that flows from it and its treatment. In other words, all harms that Mr. Mousser has proven stem from his kidney cancer or its treatment are within the scope of harm permitted by the CLJA, including Mr. Mousser's pain, his loss of a kidney, his chronic kidney disease, his psychological injuries, his physical limitations, the loss of his intimate life with his wife, his shortened life, and his loss of earning capacity. FOF ¶¶ 41–47, 51.

22. The United States contends that Mr. Mousser waived any claim for non–Track 1 conditions under Case Management Order No. 12 (D.E. 232). PTO at 17, § II.B.11(a). This argument fails. CMO 12 limits Track 1 Trial Plaintiffs to alleging that a "Track 1 Illness" was "caused by the water on Camp Lejeune, along with other injuries or conditions stemming from a Track 1 Illness or its treatment." D.E. 232 at 1. Under CMO 12, Track 1 Trial Plaintiffs waive only claims relating to "any other illnesses or injuries *besides* Track 1 Illnesses (and those injuries or conditions stemming from a Track 1 Illness or its treatment)[.]" *Id.* (emphasis added). In other words, the CMO 12 waiver explicitly excepts "injuries or conditions stemming from a Track 1 Illness or its treatment." *Id.* The harms for which Mr. Mousser seeks relief are exactly such

conditions: the loss of his right kidney; the chronic kidney disease in the kidney that remains and the renal replacement therapy it will require; the added difficulty of controlling his blood pressure with one kidney; his fear, anxiety, depression, and insomnia; the loss of his intimate life with his wife; the end of his working life; and his shortened life expectancy. FOF ¶¶ 41–47. Each stems from the Track 1 Illness (kidney cancer) or its treatment, and he does not claim that the water caused any of them independently.

## VIII. Relief

23. The CLJA authorizes "appropriate relief for harm that was caused by exposure to the water at Camp Lejeune." CLJA § 804(b). The CLJA is a tort remedy, and the relief it authorizes "extends beyond an order granting VA benefits." D.E. 227 at 16. Appropriate relief for a personal injury may include compensatory damages for past and future medical expenses, lost earning capacity, and past and future non-economic harm. "Punitive damages may not be awarded in any action under" the CLJA. CLJA § 804(g). Mr. Mousser seeks no punitive damages, and his award is limited to compensatory damages.

24. Past medical damages are measured by the reasonable value of the medical services required to treat the injury and its consequences, whether or not Mr. Mousser was billed for them or paid for them. Restatement (Second) of Torts § 924(c) & cmt. f (2026 update) (value of medical services is recoverable even if they created no liability or expense to the injured person, as when rendered gratuitously); *see also id.* § 920A(2) & cmt. c(3) (benefits from a collateral source, including gratuitous services or treatment in a veterans hospital, do not reduce the tortfeasor's damages obligation). The CLJA addresses benefits the United States itself provided through the offsets in § 804(e)(2), not by reducing the measure of the harm. That Mr. Mousser's care was furnished by VA rather than billed to him does not reduce his pre-offset damages under the CLJA;

it bears only on the offset under § 804(e)(2), which the United States must prove. D.E. 885 at 13. The Court has assessed the value of the plaintiff's past medical care, and any corresponding offsets, in the Findings of Fact. FOF ¶¶ 48, 56.

25. Future economic damages include future medical care and lost earning capacity and are awarded at present value. *See Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 537–38, 547 (1983) (an award for future economic loss must be discounted to present value as a matter of federal law for federal claims, regardless of state law); *Monessen Sw. Ry. Co. v. Morgan*, 486 U.S. 330, 339–40 (1988) (same). The Supreme Court declined to mandate a specific methodology for discounting to present value, permitting reasonable methodologies based on the facts of the case. *See Jones & Laughlin*, 462 U.S. at 546–51, 553. Mr. Staller reduced each future loss to present value, and the United States' economist takes no issue with his methods. FOF ¶¶ 49, 51.

26. In determining non-economic damages, the Court's "ultimate task" is "somehow to assign a monetary value to the injured party's intangible losses attributable to pain, suffering, disfigurement and disablement." *Finch v. Covil Corp.*, 388 F. Supp. 3d 593, 621 (M.D.N.C. 2019) (quoting *Weeks v. Holsclaw*, 306 N.C. 655, 661 (1982)), *aff'd*, 972 F.3d 507 (4th Cir. 2020). Non-economic damages may be calculated based on a suggested "amount per unit of time," *id.*, by reference to comparable cases, or by any other reasonable measure.

27. Awards for comparable injuries, adjusted to 2026 dollars, include:

- *Lucenti v. United States*, No. 19-cv-6185 (NG)(LGD), 2024 WL 3665800, at *14–16 (E.D.N.Y. Aug. 6, 2024) (about $3.0 million; missed kidney cancer, nephrectomy, Stage 3 chronic kidney disease, five years and three months of past pain and suffering, and about three years and eight months of life remaining);

- *Clanton v. United States*, No. 15-CV-124-NJR-RJD, 2017 WL 2637795, at *21–23 (S.D. Ill. June 19, 2017) (about $18.8 million in non-economic damages; kidney failure, two and a half years of dialysis, a transplant, and two further transplants projected), *vacated on other grounds*, 943 F.3d 319 (7th Cir. 2019), *aff'd after remand*, 20 F.4th 1137 (7th Cir. 2021);
- *Jackson v. United States*, No. 1:18-cv-9, ECF No. 53 (E.D. Mo. Dec. 30, 2019) (about $4.3 million; delayed prostate-cancer diagnosis at VA, permanent incontinence);
- and *Chiarino v. United States*, 189 F. Supp. 3d 1371, 1384–86 (S.D. Fla. 2016) (about $0.7 million where the delay was not shown to have changed the surgery or the prognosis).

In an asbestos wrongful-death case tried before this Court, the jury awarded $2,887,500 in compensatory damages, about $6.5 million in today's dollars, and the Fourth Circuit affirmed. *Haislip v. Owens-Corning Fiberglas Corp.*, No. 90-181-CIV-5-BO, D.E. 119 (E.D.N.C. Oct. 28, 1994), *amended*, D.E. 134 (E.D.N.C. Feb. 7, 1995) (crediting $394,200 in settlements), *aff'd*, 86 F.3d 1150 (4th Cir. 1996) (unpublished table decision).

28. Here, the Court has considered and applied these legal principles and examples to the findings of fact regarding non-economic damages discussed above, and for the reasons stated the Court concludes that non-economic damages of $___________ are legally appropriate.

29. Considering the foregoing Conclusions of Law and the Findings of Fact discussed above, the Court determines that Mr. Mousser is entitled to total compensatory damages of $___________. This amount constitutes the "appropriate relief for harm that was caused by

exposure to the water at Camp Lejeune," CLJA § 804(b), given the facts proven at trial, before any offsets required by CLJA § 804(e)(2).

30. Section 2675(b) of title 28 bars an action "for any sum in excess of the amount of the claim presented to the federal agency, except where the increased amount is based upon newly discovered evidence not reasonably discoverable at the time of presenting the claim to the federal agency, or upon allegation and proof of intervening facts, relating to the amount of the claim." Mr. Mousser's administrative claim stated a sum certain of $25,000,000.00, and the award determined here does not exceed it.

## IX. Offsets Under CLJA § 804(e)(2)

31. Subsection 804(e)(2) of the CLJA provides that "[a]ny award made to an individual . . . under this section shall be offset by the amount of any disability award, payment, or benefit provided to the individual . . . (A) under—(i) any program under the laws administered by the Secretary of Veterans Affairs; (ii) the Medicare program under title XVIII of the Social Security Act (42 U.S.C. 1395 et seq.); or (iii) the Medicaid program under title XIX of the Social Security Act (42 U.S.C. 1396 et seq.); and (B) in connection with health care or a disability relating to exposure to the water at Camp Lejeune." CLJA § 804(e)(2).

32. Subsection 804(e)(2) "contains offset source and subject-matter limits," and the Court enforces them. D.E. 885 at 7, 13. First, disability awards, payments, or benefits from sources that are not enumerated in the subsection, including from TRICARE, may not provide the basis for an offset. *Id.* at 4 n.1. Second, the award, payment, or benefit that serves as the basis for an offset must be provided "in connection with health care or a disability relating to exposure to the water at Camp Lejeune." CLJA § 804(e)(2)(B). Accordingly, awards, payments, or benefits

provided in connection with unrelated health care or disabilities may not serve as the basis for an offset.

33. Whether the United States is entitled to an offset against a damages award is an affirmative defense, and "Defendant bears the burden of proving any statutory offset." D.E. 885 at 13; *see also Durham v. SMI Indus. Corp.*, 882 F.2d 881, 883 (4th Cir. 1989) ("Setoff . . . is an affirmative defense which must be pled and proven by the party asserting it.") (citation omitted).

**A. Offsets Against Past Benefits**

34. Subsection 804(e)(2)'s subject-matter limit provides that offsets can be claimed based only on benefits provided "in connection with health care or a disability relating to exposure to the water at Camp Lejeune." CLJA § 804(e)(2)(B). Thus, for example, when a plaintiff has a combined VA disability rating, the United States must show which part qualifies. *See* D.E. 885 at 13 (recognizing that not all medical benefits provided by qualifying programs may have been connected to exposure to Camp Lejeune water). The United States carried its burden to show that Mr. Mousser's neoplasm, scar, and mood-disorder ratings are related to Camp Lejeune water exposure, FOF ¶ 56, and Mr. Mousser does not contest the cystitis rating for purposes of the offset.

35. The Court's causation findings govern both the damages and the offsets. Because Mr. Mousser's cancer caused his depression, the mood-disorder rating and the housebound award resting on it fall within the scope of § 804(e)(2). FOF ¶¶ 45–46.

36. For these reasons, the Court determines that the appropriate offset under CLJA § 804(e)(2) for past VA medical expenses is $62,854, and for past VA disability compensation through October 26, 2026, is $290,223. FOF ¶ 56. Mr. Mousser's total award must be reduced by these amounts. D.E. 885 at 10–11. The offsets reduce the award as a whole; they are not matched to any category of damages. *Id.* at 12–13.

### B. Offsets Against Future Benefits

37. While "subsection 804(e)(2) does not categorically bar evidence of future qualifying awards, payments, or benefits," the United States "must show that any proposed future offset is sufficiently certain and calculable." D.E. 885 at 9.

#### i. Future VA Disability Compensation

38. For future VA disability benefits, the United States offered only a projection that assumes nothing will change, from a witness who could not offer any opinion on whether anything will change, and considered no evidence about Mr. Mousser's own history. FOF ¶ 56. The United States did not support its conclusions that the schedule of benefits available through VA and the percentage of benefits Mr. Mousser is entitled to will remain consistent, creating significant uncertainty as to the amount of future VA compensation Mr. Mousser will receive. *See, e.g.*, *Poirier v. United States*, 745 F. Supp. 23, 33 (D. Me. 1990); *Laskowski v. U.S. Dep't of Veterans Affairs*, 918 F. Supp. 2d 301, 330 (M.D. Pa. 2013). Mr. Mousser's future VA compensation is therefore not sufficiently certain and calculable, and the Court offsets none.

#### ii. Future VA Healthcare Benefits

39. A future VA medical benefit is "provided" under the CLJA only if VA in fact furnishes or pays for the care, and the United States must prove that it is reasonably certain it will. *See* D.E. 885 at 7–9, 13. Mr. Mousser, like all veterans, has "a right to select a doctor or private hospital of his own choice for his future medical needs." *Ulrich v. Veterans Admin. Hosp.*, 853 F.2d 1078, 1084 (2d Cir. 1988); *see also Hester v. United States*, No. 8:10-cv-1565, 2012 WL 368269, at *1 (M.D. Fla. Feb. 3, 2012) ("The Government's argument in favor of setoff is based on its contention that Plaintiff will incur no expense in obtaining the future medical care for which he seeks compensation. The flaw in the Government's argument is that if Plaintiff *chooses* to get

his medical care outside of the VA, he may have to pay for such care.”). Here, the United States did not prove that it is reasonably certain that Mr. Mousser will choose VA. FOF ¶ 56; *see also Feeley v. United States*, 337 F.2d 924, 935 (3d Cir. 1964) (explaining that “[t]he plaintiff’s past use of the government facilities does not ensure his future use of them” as the plaintiff “will now have the funds available to him to enable him to seek private care”). Nor did the United States prove what the care would cost VA, so the benefit is not sufficiently “calculable.” D.E. 885 at 9; FOF ¶ 56. Because the United States has not met its burden to prove this affirmative defense, the Court offsets nothing for future VA medical care. Were the Court to reach the amount, the United States values that care at $228,147. FOF ¶ 56.

40. Plaintiffs moved to exclude in part the opinions of the United States’ economists quantifying future medical offsets. D.E. 864; D.E. 865. Because the United States did not prove any future VA medical benefit, the motion is DENIED AS MOOT as to Mr. Mousser. FOF ¶ 56.

41. Future amounts are measured at present value. Non-economic damages are fixed as of trial.

42. The United States proved offsettable benefits of $353,077. FOF ¶ 56.

## X. Judgment

43. Mr. Mousser is entitled to judgment against the United States of $__________, representing compensatory damages of $__________, less offsets of $353,077 under CLJA § 804(e)(2), together with costs under Federal Rule of Civil Procedure 54(d)(1).

44. Under CLJA § 804(e)(1), Mr. Mousser “may not thereafter bring a tort action against the United States for such harm pursuant to any other law.”

Respectfully submitted, this the 19th day of October, 2026.


/s/ Elliot S. Abrams
Elliot S. Abrams
CHESHIRE PARKER SCHNEIDER &
ABRAMS, PLLC
N.C. State Bar No. 42639
P. O. Box 1029
Raleigh, NC 27602
(919) 833-3114 (TEL)
(919) 832-0739 (FAX)
elliot.abrams@cheshirepark.com
Counsel for Plaintiff

W. Michael Dowling
DOWLING PLLC
N.C. State Bar No. 42790
PO Box 27843
Raleigh, North Carolina 27611
Telephone: (919) 529-3351
mike@dowlingfirm.com
Counsel for Plaintiff

Matthew D. Quinn
LEWIS & ROBERTS PLLC
N.C. State Bar No. 40004
3700 Glenwood Ave., Ste. 410
Raleigh, N.C. 27612
(919) 719-8538 (o)
(919) 981-0199 (f)
mdq@lewis-roberts.com
Counsel for Plaintiff

John James Snidow
KELLER POSTMAN LLC
DC Bar No. 1531799
1101 Connecticut Ave. NW, Suite 1100
Washington, D.C. 20036
Telephone: (202) 918-1123
jj.snidow@kellerpostman.com
Counsel for Plaintiff